**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UKASHU NURU, aka Ukasha Nuru,
                    *Petitioner,*

            v.

ALBERTO R. GONZALES,* Attorney
General,
                    *Respondent.*

No. 03-71391

Agency No.
A77-954-387

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Submitted September 1, 2004
Vacated February 23, 2005
Resubmitted March 24, 2005**
Pasadena, California

Filed April 21, 2005

Before: Stephen Reinhardt, A. Wallace Tashima, and
Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge Reinhardt

---

    *Alberto R. Gonzales is substituted for his predecessor, John Ashcroft, as Attorney General of the United States, pursuant to Fed. R. App. P. 43(c)(2).

    **The panel unanimously finds this case suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

4451

## COUNSEL

Steve Paek, Law Offices of Steve Paek, Los Angeles, California, for the petitioner.

Peter D. Keisler, Donald E. Keener, Francis W. Fraser, Office of Immigration Litigation, Civil Division, U.S. Department of Justice, Washington, D.C., for the respondent.

## OPINION

REINHARDT, Circuit Judge:

Warfare still continues to produce cruel, inhuman, and degrading acts of torture sanctioned or tolerated by government officials and committed even in lands that consider themselves civilized. The case before us involves one of those occurrences and requires us to decide whether the law permits the United States government to remove a victim of such treatment to his home country where he would likely, once again, be subjected to the infliction of severe physical pain and suffering, if not death.

Ukashu Nuru, a native and citizen of Eritrea, petitions for review of the Board of Immigration Appeals' ("BIA" or "Board") final order of removal, including the order denying his applications for asylum, withholding of removal, and protection under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT" or "Convention"). The immigration judge found Nuru to be a credible witness but denied him relief on the grounds that he had not suffered past persecution as a result of his political opinion and that he would not be tortured if he were returned to Eritrea. The BIA adopted these findings and further found that Nuru's punishment by the Eritrean military was not disproportionately harsh and that he had not pre-

sented evidence that any punishment he would receive in the future would be disproportionately harsh or would be inflicted on account of his political beliefs.

On review, Nuru argues that it is more probable than not that he will be tortured if he is returned to Eritrea, that he suffered persecution "on account of" his political opinion in the past, that he has a well-founded fear that he will be similarly persecuted in the future, and that he is eligible for asylum and entitled to withholding of removal, as well as protection under the Convention. We agree, and remand for the grant of relief under CAT, the award of withholding of removal, and for the exercise of the Attorney General's discretion with respect to the grant of asylum.

## FACTUAL AND PROCEDURAL BACKGROUND

Ukashu Nuru is married to a permanent resident of the United States and has a U.S. citizen son. When the Immigration and Naturalization Service ("INS")[1] sought to remove him to Eritrea on the ground that his immigration papers were fraudulent and that he did not have a lawful visa, he applied for asylum, withholding of removal, and protection under Article III of the Convention. He asserted that he was tortured by the Eritrean army as a result of his political opposition to the war between Eritrea and Sudan.

At his hearing before the immigration judge, Nuru testified regarding his military service in Eritrea. He reported that he was drafted into the Eritrean military in July 1996 and underwent more than six months of military training. He was then assigned to the front line of the Eritrean-Sudanese conflict where he dutifully served for some time in the Eritrean army. He obeyed "orders," never refusing to serve his country.

---

[1]The INS is now called the Bureau of Citizenship and Immigration Services. For the sake of consistency, we will refer to it as the INS throughout this opinion.

Nuru testified that the Sudanese forces were better armed and equipped than the Eritrean military, that the Eritrean forces were not adequately trained to face their enemy, and that his unit was attacked from the air and ground with impunity. As a result, Nuru observed the death of many of his young comrades. This troubled him. "[M]any people were dying randomly without any protection . . . against tanks, airplanes . . . . [W]e were helpless." From Nuru's point of view, the war did not make political sense because he and his comrades were fighting a losing battle in a land that was not theirs for a cause no one understood. Aside from his political opposition to the battle against the Sudanese, Nuru had no other opposition to serving in the military or with his government. He testified, "I did not support the government fighting with all [its] neighbors . . . This is the only situation that I have with the government."

Having witnessed senseless death on the front, Nuru decided to protest against the "nonsense" war. At a front line unit meeting in 1997, his battalion commander instructed the soldiers to continue fighting the losing battle against the Sudanese forces, despite the fact that the Eritrean army had sustained substantial casualties. Nuru could no longer "listen to the lies and misrepresentations of [his] foolish [commander]." Nuru stood up and voiced his political opposition to the war: "[W]e are fighting a nonsense war. This land is not our[ ]s. We are dying for nothing, why are we fighting or continuing to fight?"

The battalion commander immediately rebuked Nuru for his statements. He directed him to remain standing for the duration of the meeting, and then forced him to kneel for some period of time thereafter. When the meeting adjourned, two soldiers removed all of Nuru's possessions, stripped him of his clothes, tied his hands and feet together behind his back, and placed him on his abdomen. This position is known as the "helicopter." While he was naked and bound, his fellow soldiers repeatedly slapped him, beat him, and whipped him

with a sharp belt. They chastised and censured him. He was ordered by commanding officers "never to repeat such words in front of other people or in a meeting."

Unfortunately for Nuru, his punishment did not end there. For twenty-five days, he was tied up, naked and bound in the "helicopter" position, and left outside in the hot desert sun. For sustenance, he was given a small ration of bread, a can of food, and a cup of water daily.[2] He was forced to urinate and defecate in this bound position, and he was regularly beaten and whipped until the skin broke open on his back and feet. As a result of this cruel, inhuman, and degrading treatment, Nuru had difficulty urinating and was unable to move without assistance. The immigration judge stated that he was "amazed" that no more serious form of punishment was imposed.

Nuru eventually suffered a severe tooth infection. When he complained, other soldiers taunted him: "[D]o you expect us to give you any other relief while you are opposing our orders?" Nuru pleaded for medical attention. Finally, he was permitted to see a nurse, who prescribed a pain killer for the infection. When the pain continued, he was transferred to a nearby town to receive proper medical attention. He was unguarded while seeing a dentist who extracted his infected tooth.

Following the oral surgery, Nuru was ordered to return to his original camp — the camp at which the officers who had ordered him bound, whipped, beaten, and placed in the broiling sun for nearly one month were stationed. Rather than return to be further tortured, Nuru fled, ultimately to the United States. When questioned at his removal hearing as to why he had fled, Nuru testified that he feared his torture would continue if he returned to the camp since he was still

---

[2]As the government's brief points out, Nuru agreed that on occasion he received food twice a day. *See* Brief for Resp't at 5.

opposed to the war. "I fled to, to save my life . . . I was tortured. I had to flee," he said.

Nuru initially hid for a few days at his parents' house in Asmara and then hired a smuggler to take him into Ethiopia, where he resided with his aunt. In May 1998, a new phase of an old war between Ethiopia and Eritrea erupted. The Ethiopian government issued a proclamation ordering all individuals of Eritrean origin to report to headquarters. When Nuru failed to comply, he was seized by the Ethiopian government as a suspected spy and placed in an Ethiopian detention center, where he was denied medical attention, received meager rations, and was kicked, doused with cold water, slapped, and whipped.[3] In February 2000, Nuru's aunt secured his release by bribing a security guard. Nuru then fled to Rome where he stayed for two and a half months before entering the United States.

In Nuru's absence, the Eritrean military took strong actions in reprisal against his family. After searching his parents' home looking for him, they seized his two brothers as accessories in his desertion, and forcibly closed his father's business. His brothers have not been heard from since. Nuru asserts that if he is returned to Eritrea he will be "executed, or . . . detained in a separate place that no one could save [him]," and that the government will do this because of his expressed opposition to the war.

Following the removal hearing, the immigration judge issued an oral decision. He found Nuru to be a credible witness. The judge explained, "[T]he Court has little difficulty with [Nuru's] credibility. His elaboration of the facts that led to his departure are certainly not in conflict . . . ." Nevertheless, he denied Nuru's claims for asylum, withholding of removal, and CAT relief.

---

[3]Nuru has not made a claim based on the actions of the Ethiopian government, and neither the immigration judge nor the BIA considered the treatment by Ethiopian authorities in their respective decisions.

First, the immigration judge found that Nuru was "nothing more than a common deserter." Despite credible testimony in which Nuru proclaimed his moral and political opposition to the war in Sudan and described the statements he had made in opposition to it, and despite credible testimony that, immediately after the meeting at which he made those statements, he was subjected to cruel, inhuman, and degrading punishment for 25 days, the judge concluded with respect to the asylum and withholding claims that Nuru's opposition to the war and his flight were motivated by his "selfish" concern for his own personal safety rather than by political conviction. "It appears to this Court [that Nuru] was not concerned about his injured colleagues or his dead colleagues, he was interested about saving himself, claiming, of course, in the manner of opinion, that he opposed the senselessness of the war." The judge was "convinced that there is nothing in his fleeing that has to do with politics or any personal aversion to war short of maybe a desire to save himself. More the acts of a personal coward," he declared, "than one interested in the safety of his colleagues who are injured and dying."

Second, the immigration judge found that 25 days of deprivation, whippings, and beatings did not amount to persecution because the treatment was appropriate given the circumstances. As the judge put it, "[t]his Court is not convinced that the beating the respondent received here was not [sic] out of line in consideration of what he was doing in the middle of a combat zone."

Third, the immigration judge found that CAT was not implicated. He reasoned that "[t]here is no indication [Nuru] would fac[e] any form of torture if he was returned," although he acknowledged that it is "certainly a reasonable assumption that he would be prosecuted for desertion . . . ." Accordingly, he denied Nuru's application in all respects.

Nuru appealed to the BIA, which adopted and affirmed the immigration judge's order. It additionally concluded that

Nuru failed to establish that "his treatment for protesting his continued military service was disproportiona[te]ly harsh . . . . The respondent has not presented evidence that any punishment he will receive in the future will be disproportiona[te]ly harsh on account of his political beliefs."

Nuru seeks review of the BIA's final order of removal and denial of his application for asylum, withholding of removal, and relief under the Convention, asserting that he faces persecution and torture if he is returned to Eritrea.

## JURISDICTION

Because Nuru's removal proceedings began after April 1, 1997, his petition is governed by the permanent rules of the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub. L. No. 104-302, 110 Stat. 3656 (Oct. 11, 1996). *See Kalaw v. INS*, 133 F.3d 1147, 1149-50 (9th Cir. 1997). We have jurisdiction over Nuru's final removal order including the denial of asylum and withholding of removal pursuant to 8 U.S.C. § 1252(a)(1). *See Gormley v. Ashcroft*, 364 F.3d 1172, 1176 (9th Cir. 2004). We have jurisdiction to review his CAT claim under § 2242(d) of the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, Div. G, Title XXII, § 2242, 112 Stat. 2681-822 (1998) (codified at 8 U.S.C. § 1231). *See also* 8 C.F.R. § 1208.18(e) ("Judicial review of claims for protection from removal under Article 3 of the Convention Against Torture.").

## STANDARD OF REVIEW

Where, as here, the BIA adopts the immigration judge's decision and also adds its own reasons, we review both decisions. *See Kataria v. INS*, 232 F.3d 1107, 1112 (9th Cir. 2000) (citing *Chand v. INS*, 222 F.3d 1066, 1072 n.7 (9th Cir. 2000)). To the extent that the BIA simply affirms the immigration judge, we review the decision of that judge as if it were the final agency action. *See Kebede v. Ashcroft*, 366

F.3d 808, 809 (9th Cir. 2004). As to the BIA's additional findings, we review those findings for what they are — the final agency action. *See Ghaly v. INS*, 58 F.3d 1425, 1430 (9th Cir. 1995).

We review *de novo* the BIA's interpretation of purely legal questions. *See Murillo-Espinoza v. INS*, 261 F.3d 771, 773 (9th Cir. 2001). Factual findings underlying the agency's final order, however, are reviewed for substantial evidence. *See Khup v. Ashcroft*, 376 F.3d 898, 902 (9th Cir. 2004). The agency's eligibility and entitlement determinations must be upheld if they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Gormley*, 364 F.3d at 1176 (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)).

## ANALYSIS

Nuru contends that the record compels the conclusion that the BIA erred in denying his applications for asylum, withholding of removal, and relief under CAT. He alleges that he was tortured by the Eritrean military and that he was persecuted on account of his political opinion; he also asserts that he faces further torture and persecution if he is returned to Eritrea. These allegations and the underlying facts on which they are based support his asylum and withholding claims, as well as his CAT claim. We review each claim independently, however.

## I. Convention Against Torture

**[1]** Article III of the Convention against Torture provides that a state may not remove a person to another nation if there are "substantial grounds for believing that he would be in danger of being subjected to torture" in that nation. FARRA § 2242. The United States has signed, ratified, and codified CAT. Accordingly, "it [is] the policy of the United States not to expel . . . or otherwise effect the involuntary return of any

person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture. . . ." FARRA §2242(a) (codified at note to 8 U.S.C. § 1231); *see also Li v. Ashcroft*, 312 F.3d 1094, 1103 (9th Cir. 2002).

Nuru has the burden of proof "to establish that it is more likely than not that he . . . would be tortured if removed" to Eritrea. *Al-Saher v. INS*, 268 F.3d 1143, 1147 (9th Cir. 2001) (as amended) (alteration in original) (quoting 8 C.F.R. § 208.16(c)(2)). A "petitioner carries [his] burden whenever he . . . presents evidence establishing 'substantial grounds for believing that he would be in danger of being subjected to torture in the country of removal.' " *Kamalthas v. INS*, 251 F.3d 1279, 1284 (9th Cir. 2001) (quoting 8 C.F.R. § 208.16(c)(3)). Evidence of past torture is relevant "[i]n assessing whether [torture] is more likely than not." *Kamalthas*, 251 F.3d at 1282 (quoting 8 C.F.R. §§ 208.16(c)(2) and (3)). If an alien meets his burden of proof regarding future torture, withholding of removal is mandatory under the implementing regulations,[4] just as it is in the case of a well-founded fear of persecution. *See* Immigration and Nationality Act ("INA") § 241(b)(3), 8 U.S.C. § 1231(b)(3); 8 C.F.R. §§ 1208.16 - 1208.18.

Nuru asserts that it is more likely than not that he will be tortured if he is removed to Eritrea. He relies primarily on his testimony regarding his past cruel, inhuman, and degrading treatment. The immigration judge found his uncontradicted testimony credible. But, under the applicable law, that is not enough. "[W]hen an alien credibly testifies to certain facts, those facts are deemed true, and the question remaining to be answered becomes whether these facts, and their reasonable

---

[4]We note one qualification. If the alien has committed a "particularly serious crime" or an aggravated felony for which the term of imprisonment is at least five years, only deferral, not withholding, of removal is authorized. *See* 8 C.F.R. §§ 1208.16(d), 1208.17.

inferences, satisfy the elements of the claim for relief." *Ladha v. INS*, 215 F.3d 889, 900 (9th Cir. 2000) (as amended). Here, the immigration judge ruled that the facts testified to by Nuru did not satisfy the elements of a torture claim.

In denying Nuru's CAT application, the immigration judge concluded that Nuru (1) had not been tortured and (2) had not established that it was more likely than not that he would be tortured if he were removed to Eritrea. He stated that there "is no indication that he would fac[e] any form of torture if he was returned" and that the Convention was not "at all implicated." The BIA adopted those findings on the CAT question. We are compelled by the record to hold to the contrary.

**[2]** To receive relief under the Convention, Nuru must show that the gravity of the treatment he will likely suffer if he is removed to Eritrea rises to the level of "torture." The CAT and its implementing regulations define torture as

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 1208.18(a)(1); FARRA § 2242 (same); U.N. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Feb. 4, 1985, art. 1.1, 1465 U.N.T.S. 85 (same).[5] Thus, torture is "any act by which severe

---

[5]The United States Senate included a reservation when it ratified the Convention, narrowing the definition of torture with respect to "mental

pain or suffering, whether physical or mental, is intentionally inflicted on a person" for the purposes of obtaining information or a confession, *punishment*, intimidation, coercion, or discrimination. *See* FARRA § 2242; 8 C.F.R. § 1208.18(a)(1).

**[3]** In assessing whether it is more likely than not that Nuru would be tortured if he is removed to Eritrea, the implementing regulations require that

> all evidence relevant to the possibility of future torture . . . be considered, including, but not limited to: (i) Evidence of past torture inflicted upon the applicant; (ii) Evidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured; (iii) Evidence of gross, flagrant or mass violations of human rights within the country of removal, where applicable; and (iv) Other relevant information regarding conditions in the country of removal.

8 C.F.R. § 1208.16(c)(3). *See also Kamalthas*, 251 F.3d at 1282.

---

pain or suffering." The reservation states that "mental pain or suffering refers to prolonged mental harm caused by or resulting from (1) the intentional infliction or threatened infliction of severe physical pain or suffering; (2) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality; (3) the threat of imminent death; or (4) the threat that another person will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality." U.S. Reservations to CAT, *available at* <http://www.ohchr.org/english/countries/ratification/9.htm#N11>. Because Nuru's CAT claim is based on severe physical (rather than mental) pain and suffering, the U.S. reservation does not affect his claim.

## A.  Past Torture

**[4]** We begin our review of Nuru's CAT claim by deter-
mining whether he was a victim of past torture. *See* 8 C.F.R.
§ 1208.16(c)(3)(i); *Kamalthas*, 251 F.3d at 1282. Past torture
is the first factor we consider in evaluating the likelihood of
future torture because past conduct frequently tells us much
about how an individual or a government will behave in the
future. Specifically, if an individual has been tortured and has
escaped to another country, it is likely that he will be tortured
again if returned to the site of his prior suffering, unless cir-
cumstances or conditions have changed significantly, not just
in general, but with respect to the particular individual.[6]

In the case before us, Nuru was beaten and whipped "al-
most daily," bound nude in the desert sun in a most painful
position, and deprived of adequate food and water, for 25 con-
secutive days, thereby causing him severe physical pain and
suffering. The flesh on his back and the soles of his feet was
ripped open. His urinary system was damaged and he had so
many injuries that he could not move without assistance. The
severe form of cruel and inhuman treatment to which Nuru
was subjected by the Eritrean army falls well within the defi-
nition of torture set forth in the Convention. *See Al Saher*, 268
F.3d at 1147 (holding that actions that were "specifically
intended by officials to inflict severe physical pain on [the
petitioner]" constituted torture); *In re G-A*, 23 I. & N. Dec.
366 (B.I.A. 2002) (approving CAT relief where petitioner
would be sentenced to an Iranian prison in which prisoners
were routinely suspended from ropes, burned with cigarettes,

---

[6]We have previously held with respect to the presumption of a well-
founded fear of persecution that in asylum and withholding of removal
cases an " 'individualized analysis' of how changed conditions will affect
the specific petitioner's situation is required. Information about general
changes in the country is not sufficient." *Garrovillas v. INS*, 156 F.3d
1010, 1017 (9th Cir. 1998) (citations omitted). The same reasoning applies
in the torture context with respect to improvements in the area of human
rights violations. Individualized consideration is necessary.

whipped, beaten, and punched). Nevertheless, despite compelling evidence that Nuru had been tortured, the immigration judge and the BIA inexplicably concluded that he had not.

[5] In *Al-Saher*, 268 F.3d at 1144-48, the petitioner, an Iraqi, was in his country's military, and was arrested by the Iraqi police for misrepresenting his religion and place of birth in his application for military service. *Id*. Al-Saher was detained, interrogated, and beaten by Iraqi police on two separate occasions. The first time, he was beaten for 10 to 20 days. *Id.* at 1145. He described the torturous treatment he received, declaring that on a number of occasions two people came in, blindfolded him, tied his hands behind his back, and beat him to the point at which he could barely stand. *Id.* The second series of beatings occurred over a shorter period of time. We held on the basis of the undisputed facts and the Country Report, that Al-Saher was entitled to relief under CAT. Nuru's claim is similar in many respects. Both applicants were subjected to extremely harsh physical punishment by their respective governments for a violation of the military rules; both were members of the active military; both suffered painful physical injuries; both fled their native lands; and both feared that they would be subjected to a recurrence of the harsh punitive treatment if removed to their respective countries. On the relevant facts, Nuru's application is not distinguishable from Al-Saher's; the severe physical pain and suffering inflicted upon him by the Eritrean army is of at least equal gravity and the evidence is, as in *Al-Saher*, uncontroverted. Thus, precedent as well as reason compels the conclusion that Nuru was, in the past, subjected to torture in Eritrea.

## B. Future Torture

Although past torture is ordinarily the principal factor on which we rely when an applicant who has previously been tortured seeks relief under the Convention, we also look to evidence of gross, flagrant, or mass violations of human rights within that nation and to any other relevant information

regarding current country conditions, as well as evidence regarding whether that person could safely relocate to a different area of the country. *See* 8 C.F.R. § 1208.16(c)(3); *Kamalthas*, 251 F.3d at 1282 ("[A]ll evidence relevant to the possibility of future torture shall be considered, including, but not limited to . . . [e]vidence of gross, flagrant or mass violations of human rights within the country of removal; and . . . [o]ther relevant information regarding conditions in the country of removal.").

**[6]** Initially, we note that there is no evidence in the record that Nuru could relocate to a part of Eritrea in which he is not likely to be tortured. This is not surprising, as it will rarely be safe to remove a potential torture victim on the assumption that torture will be averted simply by relocating him to another part of the country. Next, we examine the State Department's Country Report for Eritrea. It is well-accepted that country conditions alone can "play a decisive role in granting relief under [CAT]." *Id.* at 1283 (holding that a negative credibility finding in an asylum claim does not preclude relief under CAT, especially where documented country conditions information corroborate the "widespread practice of torture against Tamil males"). The 2000 Eritrean Country Report describes major human rights violations committed by members of the military and police. According to that Report, Eritrean police

> occasionally resort to *torture* and physical beatings of prisoners . . . . [T]he police severely mistreated and beat army deserters and draft dodgers, and the army subjected deserters and draft dodgers to various military disciplinary actions that included prolonged sun exposure in temperatures of up to 113 degrees Fahrenheit, or the tying of hands and feet for extended periods of time.

2000 Country Report (emphasis added), *available at* <http://

www.state.gov/g/drl/rls/hrrpt/2000/af/782.htm>.**[7]** The Country Report confirms that Eritrea routinely prosecutes persons thought to be deserters and subjects at least some of them to torture. Although the reason that Nuru was tortured before he fled Eritrea was because of his front-line speech in opposition to the war and although he had neither deserted the military nor refused to perform any military service at the time he was subjected to the punitive treatment described above, *after* he was tortured he fled the country and, as a result, failed to fulfill his military obligation. Accordingly, as of now, he undoubtedly qualifies in the minds of the Eritrean authorities as a deserter. The Country Report states that those who shirk military service are subjected to punitive treatment that is similar to that administered to Nuru prior to his flight. Now that Nuru has deserted the military in an effort to save his life and to avoid further torture, it is, as the immigration judge acknowledges, a "reasonable assumption that he will be prosecuted for desertion." Thus, if Nuru is involuntarily returned to Eritrea, it is more probable than not that he will suffer a recurrence of the treatment to which he was subjected previously, treatment that we recognize as constituting "torture."

Nuru provided additional evidence as well. He testified that the Eritrean army has continued to look for him and that, in his absence, it has engaged in reprisals against his family. Subsequent to his flight to Ethiopia, his father's business was closed and his two brothers were forcibly kidnapped. Their whereabouts are still unknown. The Country Report notes that the government deployed military police in Asmara, where Nuru's family lives, to find deserters and draft dodgers. In sum, Nuru's testimony and the Country Report confirm that

---

**[7]**According to subsequent Country Reports (which were not introduced into the record) treatment of deserters in Eritrea has only worsened. The 2002 Report (*available at* <http://www.state.gov/g/drl/rls/hrrpt/2002/18202pf.htm>) states, for example, that the government has authorized the use of deadly force against anyone resisting or attempting to flee during searches for deserters and draft evaders.

those in Eritrea who desert or otherwise seek to avoid military service are likely to find themselves subjected to torture. On the basis of the unrefuted evidence, we are compelled to conclude that Nuru would more likely than not be one of those victims.[8]

[7] Although torture is prohibited in all circumstances, relief is available under CAT only if the torture is inflicted for one of the purposes identified in the Convention: if it is inflicted "for such purposes as" obtaining information or a confession, *punishment*, intimidation, coercion, or for any reason based on discrimination of any kind. *See* FARRA § 2242; 8 C.F.R. § 1208.18(a)(1). The "such . . . as" language makes CAT's list of purposes illustrative, not restrictive or exhaustive. *See Matter of J-E*, 23 I. & N. Dec. 291, 298 (B.I.A. 2002) ("The definition of torture illustrates, but does not define, what constitutes a proscribed or prohibited purpose."); S. Exec. Rep. No. 101-30, at 14 (same). Because Nuru's past torture was inflicted as punishment, the purpose requirement of CAT is met, at least insofar as his past torture is concerned.

Moreover, the immigration judge found that it was "certainly a reasonable assumption that [Nuru] would be prosecuted for desertion" upon removal to Eritrea. It is an equally reasonable assumption that he would be convicted of that offense. As we have already concluded that the punishment he

---

[8]Nuru's treatment is also substantiated by Amnesty International's most recent annual report on Eritrea (which is also not a part of the record). The Report states that "[t]orture is used as a standard form of military punishment. Prisoners are commonly beaten but the special and principle [sic] torture method is 'tying.' . . . The most commonly described torture method is tying with [a] rope, and the most common form is nicknamed 'the helicopter.' " Amnesty International, *Eritrea: 'You have no right to ask' - Government resists scrutiny on human rights*, May 2004, *available at* <http://web.amnesty.org/library/print/ENGAFR640032004>. The report concludes that national service conscripts, members of the armed forces deserting the army, and critics of the government are among the categories of people who are most at risk for arbitrary detention, torture and ill-treatment, or possible extra-judicial execution. *Id.*

would likely receive constitutes torture, the fact that he may be punished for desertion rather than, or in addition to, his opposition to the Sudanese war is of no consequence. Whether used as a means of punishing desertion or some other form of military or civilian misconduct or whether inflicted on account of a person's political opinion, torture is *never* a lawful means of punishment.

## C.   Lawfulness of Torture

The immigration judge ultimately denied Nuru relief on the ground that the punishment he received did not constitute torture because it was lawful punishment duly sanctioned by official authority. Specifically, the judge stated that it is within the sovereignty of the government to "require military service of its youth [and it can] punish those violators in any lawful manner." He also determined that the treatment to which Nuru was subjected by the Eritrean army was appropriate, given the circumstances. As the judge declared, "[t]his Court is not convinced that the beating the respondent received here was not [sic] out of line in consideration of what he was doing in the middle of a combat zone." In this respect, he committed clear legal error.

[8] The Convention excludes "pain or suffering arising only from, inherent in or incidental to lawful sanctions" from the definition of torture. CAT, art. I.1. However, because it does not provide a definition of "lawful sanctions," the United States Senate was concerned when it ratified the Convention that the "lawful sanctions" exception could be interpreted too broadly. Although the Senate did not adopt a reservation defining the term, it did qualify its ratification with the understanding that a state "could not through its domestic sanctions defeat the object and purpose of the Convention to prohibit torture." 136 Cong. Rec. 36,198 (1990). In light of this qualification, the Attorney General promulgated implementing regulations defining "lawful sanctions" as "judicially imposed sanctions and other enforcement actions authorized by law,

including the death penalty," *but* only so long as those sanctions do not "defeat the object and purpose of [CAT] to prohibit torture." 8 C.F.R. § 1208.18(a)(3).[9] Accordingly, Nuru is entitled to relief under the Convention if he has shown that "he is more likely than not to suffer intentionally-inflicted cruel and inhuman treatment that either (1) is not lawfully sanctioned by that country or (2) is lawfully sanctioned by that country, *but* defeats the object and purpose of CAT." *Wang v. Ashcroft*, 320 F.3d 130, 134 (2d Cir. 2003) (emphasis added).

A government cannot exempt torturous acts from CAT's prohibition merely by authorizing them as permissible forms of punishment in its domestic law. Discussing the applicability of the Convention to situations in which a state has inflicted torturous punishment authorized by its laws, the Second Circuit recently held that,

> It would totally eviscerate the CAT to hold that once someone is accused of a crime it is a legal impossibility for any abuse inflicted on that person to constitute torture . . . . When the Senate considered the CAT, its concern over the CAT's reference to 'lawful sanctions' led it to qualify its ratification with the understanding that a state 'could not through its domestic sanctions defeat the object and purpose of [CAT] to prohibit torture'. . . . [I]t was Congress'

---

[9]Even aside from the implementing regulations, it is well-accepted in international law on treaty interpretation that a party-state may not take actions that defeat the object and purpose of the treaty or convention. *See* Vienna Conv. on the L. of Treaties, May 23, 1969, art. 31(1), 1155 U.N.T.S. 331 (1969) ("A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in light of its object and purpose."). Thus, the portion of the federal regulations that limits the exclusion of lawfully imposed sanctions to those that are consistent with the object and purpose of the Convention is simply a reaffirmation of the rule that must in any event be applied under controlling international law.

aim for the CAT's protections to extend to situations where the victim has been accused of a crime.

*Khouzam v. Ashcroft*, 361 F.3d 161, 169 (2d Cir. 2004) (citation omitted).

[9] The immigration judge's finding that the punishment Nuru received is lawful simply ignores the fact that the acceptance of Eritrea's torturous punishment of Nuru would defeat the object and purpose of CAT to "eliminate torture and other cruel, inhuman or degrading treatment or punishment." S. Exec. Rep. No. 101-30, at 3. *See also* 8 C.F.R. § 1208.18(a)(2). While the punishment of draft dodgers, military deserters, and even members of the military who fail to follow military rules or orders is certainly within a country's sovereignty, torture cannot be "inherent in or incidental to lawful sanction" and is *never* a lawful means of punishment. The official sanctioning of torture necessarily defeats the object and purpose of the Convention. CAT outlaws torture absolutely: "No exceptional circumstances whatsoever, whether a state of war or threat of war, internal political instability or any other public emergency, may be invoked as a justification for torture." CAT, art. 2. This absolute prohibition on torture could not be clearer.[10]

---

[10]Controversy has raged, largely in the academic world, over the "ticking bomb" question. *Compare* Alan M. Dershowitz, *Why Terrorism Works: Understanding the Threat, Responding to the Challenge* 142-49 (2002) (arguing that torturing the suspect in the "ticking bomb" case is permissible); Michael Walzer, *Political Action: The Problem of Dirty Hands, in War and Moral Responsibility* 62, 69 (Marshall Cohen et al. eds., 1974) (same), *with* William F. Schulz, The Torturer's Apprentice, *The Nation*, May 13, 2002, at 26 (arguing that the "ticking bomb" scenario is flawed and that torture is never permissible). The "ticking bomb" is a classic case familiar to all those who have survived a freshman philosophy class: "Suppose the authorities are holding a suspect who knows where a ticking bomb is located, a bomb that will kill hundreds of people if it explodes. Would they be justified in torturing the suspect to procure the information and thereby save innocent lives?" *Id.* That dispute is irrelevant to the question before us. We are not presented with the use of torture in order to obtain information, but rather, with the authorization of torture as a means of punishment.

In fact, we have previously held that the prohibition on torture has attained the status of *jus cogens* under international law. *See Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 717 (9th Cir. 1992), *cert. denied*, 507 U.S. 1017 (1993). Unlike customary international law which, "like international law defined by treaties and other international agreements, rests on the consent of states," *jus cogens* norms apply universally to states and individuals. *Id.* Therefore, the proscription against torture "transcend[s] such consent" of states and individuals. *Id.* at 715. Despite the immigration judge's assertion that "the beating Nuru received was not out of line in consideration of what he was doing in the middle of a combat zone," the prohibition on torture is categorical: Even in war, torture is not authorized. *See* CAT, art. 2.2 ("No exceptional circumstances . . . [including] war . . . may be invoked as a justification of torture."). Indeed, torture is illegal under the law of virtually every country in the world[11] and under the

---

[11]*See, e.g.,*18 U.S.C. § 2340-2340A (criminalizing torture); Arg. Const. ch. 1 (Declarations, Rights and Guarantees), § 18 ("Death penalty for political causes, any kind of tortures and whipping, are forever abolished."); Braz. Const. art. 5 ("[N]o one shall be submitted to torture or to inhuman or degrading treatment."); Eri. Const. ch. III, art. 16, cl. 2 ("No person shall be subject to torture or to cruel, inhuman or degrading treatment or punishment."); Eth. Const. ch. III (Fundamental Rights and Freedoms), pt. 1 (Human Rights), art. 28 (Crimes Against Humanity) ("Criminal liability of persons who commit crimes against humanity . . . such as . . . torture shall not be barred by statute of limitation. Such offences may not be commuted by amnesty or pardon of the legislature or any other state organ."); Iran Const. § 3 (Rights of the People), art. 38 ("All forms of torture for the purpose of extracting confession or acquiring information are forbidden."); Penal Law § 277 (Isr.) ("A public servant who does . . . the following is liable to imprisonment for three years: (1) uses or directs the use of force or violence against a person for the purpose of extorting from him or from anyone . . . a confession of an offense or information relating to an offense . . ."); Japan Const. ch. III (Rights and Duties of the People), art. 36 ("The infliction of torture by any public officer and cruel punishments are absolutely forbidden."); Russ. Const. ch. II (Rights and Liberties of Man and Citizen), art. 21 (Human Dignity) ("No one may be subjected to torture, violence or any other harsh or humiliating treatment or punishment."); Thai. Const. ch. 3 (Rights and Liberties of the Thai People), § 31 ("A torture, brutal act, or punishment by a cruel or inhumane means shall not be permitted . . . .").

international law of human rights.[12] We cannot therefore ever view torture as a lawful method of punishment.

## D. Summary

[10] We are compelled to conclude that Nuru was tortured by the government of Eritrea and would likely face similar treatment if he is returned to that country. Accordingly, we grant the petition with respect to the CAT claim and remand it to the BIA for entry of an order granting withholding of removal under CAT.[13]

---

[12]*See* European Convention for the Protection of Human Rights and Fundamental Freedoms, *opened for signature* Apr. 11, 1950, 213 U.N.T.S. 222, art. 3 (prohibiting torture by stating that, "[n]o one shall be subjected to torture or to inhuman or degrading treatment or punishment"); African Charter on Human and Peoples' Rights, *opened for signature* June 27, 1981, O.A.U. Doc. CAB/LEG/67/3 rev. 5, 21 I.L.M. 58, art. 5 (1982) (stating that "[a]ll forms of exploitation and degradation of man, particularly . . . torture, cruel, inhuman or degrading punishment and treatment shall be prohibited"); American Convention on Human Rights, *opened for signature* Nov. 22, 1969, 1144 U.N.T.S. 123, art. 5(2) (stating that "[n]o one shall be subjected to torture or to cruel, inhuman or degrading punishment or treatment. All persons deprived of their liberty shall be treated with respect for the inherent dignity of the human person"); Geneva Convention Relative to the Treatment of Prisoners of War, *opened for signature* Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135, art. 17 (stating that "[n]o physical or mental torture, nor any other form of coercion, may be inflicted on prisoners of war to secure from them information of any kind whatever"); Universal Declaration of Human Rights, G.A. Res. 217A, U.N. GAOR, Dec. 10, 1948, art. 5 *available at* <http://www.unhchr.ch/udhr/> (stating that "no one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment"); Nuremberg Trials Final Report, Control Council Law No. 10, art. 2(1)(c) (1945) (authorizing prosecution for torture).

[13]Nuru has not waived or failed to exhaust his CAT claim. The only means that he had of raising a claim for relief under the Convention was through an "Application For Asylum and Withholding of Removal," which he completed at the time the INS issued him a notice of removal. *See Eduard v. Ashcroft*, 379 F.3d 182, 195 (5th Cir. 2004) (holding that when no other application for relief under the Convention is available, a

## II. Asylum

Nuru also contends that the BIA erred in denying his application for asylum. The immigration judge and the BIA concluded that Nuru was not eligible for asylum because he (1) had not suffered disproportionately harsh treatment on account of a statutory ground, and (2) did not establish that he had a well-founded fear that he would suffer disproportion-

---

petitioner may raise a CAT claim through an Application For Asylum and Withholding of Removal). In that application, he affirmed that he "fear-[ed] being subjected to torture (severe physical or mental pain or suffering, including rape or other sexual abuse) in [his] home country" and attached a declaration to the application describing the past torture he suffered and setting forth his fear of future torture. By declaring that he had a fear of future torture on his application for asylum and presenting evidence to support that claim at his hearing, Nuru placed his CAT claim at issue. *See* 8 C.F.R. § 1208.13(c)(1) (requiring the agency to consider "eligibility for withholding of removal under the Convention . . . if the applicant requests such consideration or *if the evidence presented by the alien indicates that the alien may be tortured in the country of removal.*" (emphasis added)). Further, the immigration judge analyzed and decided the allegations of torture according to the standard outlined in the implementing regulations for the Convention. *See Al-Saher*, 268 F.3d at 1147 (quoting 8 C.F.R. § 208.16(c)(2)).

Likewise, Nuru placed his CAT claim at issue before the BIA and this court. In his notice of appeal to the BIA, Nuru expressly sought review of the immigration judge's denial of his asylum, withholding, *and* CAT requests for relief. As well, in his brief before the BIA he squarely presented the issue of "[w]hether the Immigration Judge . . . abused his discretion in denying Petitioner's . . . relief under Article III of [CAT]." Throughout that brief he provided facts that established his claim of torture and legal arguments supporting a grant of relief under the Convention. Finally, before this court, he sought to preserve his CAT claim in his opening brief, specifically stating that he was seeking relief on that claim. He further supported his claim for relief under CAT in a supplemental brief. Given that Nuru's CAT claim relies on the identical facts as the asylum and withholding claims, that all the relevant facts are presented in the record, and that all concerned had adequate notice that Nuru sought relief under CAT, he has sufficiently and properly presented his torture claim to the BIA and to this court. *See also* n.15, *infra*.

ately harsh treatment on such basis in the future. We reject those conclusions.

### A.  Past Persecution

The immigration judge determined that Nuru was not persecuted by the Eritrean army because the beatings he received were appropriate, given that he publicly voiced strong opposition to the war at a meeting of his military unit in the battle area. *See* Admin. R. at 46 ("This Court is not convinced that the beating the respondent received here was not [sic] out of line in consideration of what he was doing in the middle of a combat zone."). Affirming that reasoning, the BIA likewise concluded that "the respondent has failed to establish that his treatment for protesting his continued military service was disproportiona[te]ly harsh, particularly in light of the circumstances under which it occurred." The agency's analysis is contrary to law.

[11] First, we have already determined that the immigration judge and the BIA erred in failing to recognize that Nuru was tortured by the Eritrean military. In finding that Nuru was tortured, we also necessarily determined that the acts committed by the military rose to the level of persecution. It follows that if those acts were committed "on account of" one of the five statutory grounds set forth in the INA, Nuru has sufficiently established that he has been *persecuted* within the meaning of the Act, and that he is entitled to a presumption that he has a well-founded fear of future persecution.[14] This is because torture is more severe than persecution and the standard of

---

[14]In another recent case, we found that treatment similar to that Nuru suffered in Eritrea constituted persecution. In *Ndom v. Ashcroft*, 384 F.3d 743 (9th Cir. 2004), we held that credible death threats made to the petitioner and 25 days spent by him in dark, crowded cells without formal charges and with no indication of when he would be released, in shackles that prevented him from straightening his legs, and without the benefit of a toilet in which he could urinate rose to the level of "persecution" necessary to support an asylum claim. *See id.* at 753.

proof for the CAT claim is higher than the standard of proof for an asylum claim. *Compare Kamalthas*, 251 F.3d at 1284 (stating that the CAT burden of proof is "more likely than not") *with Khup*, 376 F.3d at 904 (stating that in an asylum case, "even a ten percent chance of persecution may establish a well-founded fear."). This is not to say that every finding of torture necessarily establishes an asylum or withholding claim. As we explained in *Kamalthas*,

> [CAT]'s reach is both broader and narrower than that of a claim for asylum or withholding of deportation: coverage is broader because a petitioner need not show that he or she would be tortured 'on account of' a protected ground; it is narrower, however, because the petitioner must show that it is 'more likely than not' that he or she will be tortured, and not simply persecuted upon removal to a given country.

251 F.3d at 1283. Here, even though he established that he was tortured, Nuru must still establish that the persecutory treatment was on account of one of the five statutory grounds.

The forgoing analysis, however, disposes of the immigration judge's and the BIA's denials of Nuru's asylum claim on the ground that the treatment he suffered was not disproportionately harsh. That part of the agency's decision is foreclosed by our holding on the CAT claim. Torture is *per se* disproportionately harsh; it is inherently and impermissibly severe; and it is *a fortiori* conduct that reaches the level of persecution. *See, e.g., Rasaq Dipo Salaam v. INS*, 229 F.3d 1234, 1240 (9th Cir. 2000) (finding torture sufficient to establish past persecution); *Ratnam v. INS*, 154 F.3d 990, 996 (9th Cir. 1998) (holding that extra-prosecutorial torture, even if conducted for a legitimate purpose, constitutes persecution); *Surinder Singh v. Ilchert*, 69 F.3d 375, 379 (9th Cir. 1995) (finding torture sufficient to establish past persecution). As torture is universally proscribed, the conduct that comprises

torture is inherently disproportionate, whether for purposes of determining "persecution" or otherwise. As we have made clear earlier in this opinion, no one, whether on or off the battlefield, can ever lawfully be punished by means that constitute torture.[15]

## B. On Account of Political Opinion

[12] Nuru alleges that his past persecution was on account of his "political opinion" — his views in opposition to the war in Sudan. Political opinion constitutes one of the five statutory grounds underlying asylum claims. *See Navas v. INS*, 217 F.3d 646, 655 (9th Cir. 2000).

---

[15]The government's argument that Nuru failed to claim past persecution is without merit. Nuru's brief specifically sets forth the injurious physical acts to which he was subjected and argues that the immigration judge erred in failing to give "the treatment he received" the proper legal significance. He cited and relied on cases in which past persecution was at issue. *See, e.g., Pitcherskaia v. INS*, 118 F.3d 641 (9th Cir. 1997). Although Nuru's brief could have been written more clearly and he did not utter the magic words "past persecution," "[w]e will not ignore the ultimate objective of [his] appeal . . . by parsing [his] brief's language in a hyper technical manner." *Mamouzian v. Ashcroft*, 390 F.3d 1129, 1136 (9th Cir. 2004); *see also Ndom*, 384 F.3d at 750-51 (construing an "inartful" brief in petitioner's favor). Given Nuru's application and the briefs and other documents filed before the agency, it is clear that one of his "ultimate objective[s]" was to establish his entitlement to the presumption of a well-founded fear of persecution on the basis of past persecution. Furthermore, even if he had failed to brief past persecution, "we may review an issue not presented in an opening brief if a failure to do so would result in a manifest injustice." *Mamouzian*, 390 F.3d at 1136 (citing *Koerner v. Grigas*, 328 F.3d 1039, 1048-49 (9th Cir. 2003)).

Finally, even if Nuru's failure to use the specific words "past persecution" in his brief served to deprive him of the benefit of the presumption that arises from establishing that element of an asylum claim, the facts that show that he was persecuted in the past would nevertheless enable him to prevail ultimately on his claim of a well-founded fear of future persecution. *See* pt. II(C), *infra*.

> [A]n asylum applicant must satisfy two requirements in order to show that he was persecuted 'on account of' a political opinion. First, the applicant must show that he held (or that his persecutors believed that he held) a political opinion. Second, the applicant must show that his persecutors persecuted him (or that he faces the prospect of such persecution) *because of* his political opinion.

*Id.* at 656 (emphasis in original and internal citations omitted). Nuru has met both of these requirements.

The immigration judge held that Nuru was a coward rather than an individual with political beliefs. *See* Admin. R. at 46 ("The Court is equally convinced that there is nothing in his fleeing that has to do with politics or any personal aversion to war short of maybe a desire to save himself."). The BIA agreed, additionally stating "[t]he respondent has not presented evidence that any punishment he will receive in the future will be disproportiona[te]ly harsh on account of his political beliefs." The record simply does not contain any evidence supporting the agency's conclusions.

Initially, Nuru bears the burden of proving that he held a political opinion (or that one was imputed to him) at the time he was persecuted. *See Navas*, 217 F.3d at 656. Nuru, who was found to be credible, testified that at a unit meeting he stated, "[W]e are fighting a nonsense war. This land is not our[s]. We are dying for nothing, why are we fighting or continuing to fight?" He further testified that his motivation for making these statements was that he "opposed the system of government at that time, [he] did not support the government fighting with all their neighbors, and [he spoke] loudly [his] opposition. This is the only situation that [he has] with the government . . . ." Not only is the content of Nuru's speech political, but the fact that he was punished for it and ordered not to repeat his comments in public provides substantial evidence that those who heard it believed it to be political.

Although the immigration judge accused Nuru of being a "personal coward" who was "not concerned about his injured colleagues," there is not a jot of evidence in the record that would support an inference that Nuru was other than sincere in voicing his opposition to the Sudanese war; nor is there a tittle, let alone a substantial amount, of evidence supporting the judge's determination that Nuru was a "personal coward" whose actions that led up to his fleeing his homeland had nothing "to do with politics or any personal aversion to war short of maybe a desire to save himself." Rather, the immigration judge's conclusions are based on pure supposition. Such rank speculation and conjecture "cannot be substituted for objective and substantial evidence." *Bandari v. INS*, 227 F.3d 1160, 1167 (9th Cir. 2000).

**[13]** Having established that he had a political opinion, Nuru must also show that the Eritrean army persecuted him *because of* that opinion. *See Navas*, 217 F.3d at 656. For Nuru to satisfy his burden of establishing a causal connection between his political opinion and his persecutor's motivation, he need show only that the persecution was due *in part* to his opposition to the war. *See Borja v. INS*, 175 F.3d 732, 735-36 (9th Cir. 1999) (en banc). There can be no doubt that Nuru's persecutors were aware of that opposition. Nuru publicly voiced his political opposition in front of his battalion commander at a unit meeting. He testified that when he finished making his statement, he was ordered by this commanding officer to remain standing and that his persecution by "angry" members of the army commenced upon the conclusion of the meeting. He also testified that he was ordered to "never repeat such words in front of other people or in a meeting." Finally, there is no evidence in the record to indicate that there was any other reason for the persecutory treatment.[16] *See Nasseri*

[16]Neither the immigration judge nor the BIA stated that the reason for the punishment Nuru received was that his speech was deemed to be disruptive of the morale of his fellow soldiers or of military discipline. Nor is that a likely reason. Nuru was ordered never to express similar views

*v. Moschorak*, 34 F.3d 723, 729 (9th Cir. 1994) (finding persecution when there is no other logical reason for the persecutory treatment); *Rodriguez-Roman*, 98 F.3d at 429-30 (same).[17] The record contains substantial evidence compelling the conclusion that Nuru's persecutors were aware of and motivated by his political opinion. Thus, the only remaining question as to the asylum claim is whether Nuru has a well-founded fear of future persecution.

## C. Future Persecution

**[14]** Because Nuru suffered past persecution on account of political opinion, he is entitled to a presumption of a well-founded fear of future persecution. *See* 8 C.F.R. § 1208.13(b).

---

in front of "other people." There was no limitation as to location or as to type of audience. Thus, it is evident that the purpose was to suppress the content of the ideas. In any event, even if the effect on morale had been *a* reason for the persecutory treatment afforded Nuru, the "on account of" requirement would be satisfied because "political opinion" constituted *another* reason therefor. *See infra* at 4482-84; *Borja v. INS*, 175 F.3d at 735-36.

[17]To the extent that the immigration judge may have suggested that Nuru was punished because he was a "common deserter," he confuses the reasons for Nuru's past persecution (i.e., his political opposition to the Sudanese conflict) with one of the grounds upon which Nuru may be persecuted in the future (i.e., his desertion from the military following his punishment by torture). While the motivation for any future persecution to which Nuru might be subjected may be relevant to the question whether he has a well-founded fear of future persecution, it is *not* relevant to whether he has established past persecution. The judge's characterization of Nuru as a "common deserter" is also simply incorrect factually. Nuru dutifully served his country for nearly a year. Even when voicing his political opposition to the war in Sudan, he did not refuse to continue fighting. He repeatedly testified that he had *no* objection, religious or otherwise, to military service; his "only situation . . . with the government" was that he and his army colleagues were fighting a "nonsense war" and "dying for nothing" in a "land that is not [theirs]." He fled the country only *after* he was punished. There is simply no evidence to support the immigration judge's characterization, and it is speculative at best.

The burden therefore shifts to the government. *See Ali v. Ashcroft*, 394 F.3d 780, 788 (9th Cir. 2005). Unless the government carries its burden, the applicant is deemed to have established his eligibility. *See Korablina v. INS*, 158 F.3d 1038, 1043 (9th Cir. 1998). Usually, the government attempts to rebut the presumption by proving a "fundamental change in circumstances," such that the asylum-seeker no longer has a well-founded fear of persecution. 8 C.F.R. § 1208.13(b)(1)(i)(A).

**[15]** The government argues, as it did to the immigration judge and the BIA, that Nuru's circumstances have changed because he will be punished for desertion if he returns to Eritrea and desertion is a run-of-the-mill criminal act. Thus, it contends that if Nuru is punished on his return it will be on account of criminal wrongdoing rather than on account of his political opinion. This argument cannot prevail, if only because the fact that Eritrea may have more than one motivation for punishing Nuru in the future (i.e., desertion *and* political opposition to the war) does not in any way undercut his asylum claim. Like most human conduct, incarceration, persecution, and torture frequently result from mixed or multiple motives. A guerilla group may beat and torture a factory worker in part because of a desire to extort money from him; at the same time it may be persecuting him because he is in its view a traitor to his class — a worker who opposes the rebels' political aims and refuses to join. *See Borja*, 175 F.3d at 735-36. An applicant for asylum need not prove that his well-founded fear of future persecution is based *exclusively* on a ground for refugee status enumerated under 8 U.S.C. § 1101(a)(42)(A) ("race, religion, nationality, membership in a particular social group, or political opinion"). Rather, so long as one of the motives for the feared persecutory conduct relates to a protected ground, the petitioner is eligible for relief. *See Borja*, 175 F.3d at 736; *Rodriguez-Roman*, 98 F.3d at 430 n.23; *Harpinder Singh v. Ilchert*, 63 F.3d 1501, 1509 (9th Cir. 1995) ("Persecutory conduct may have more than

one motive, and so long as one motive is one of the statutorily enumerated grounds, the requirements have been satisfied.").

Assuming *ad arguendo* that desertion would constitute a lawful basis for the punishment Nuru would receive should he be returned to Eritrea,[18] he would still be able to show that he had a well-founded fear of future persecution if the punishment were *also* imposed in part on account of his political opinion. Given Nuru's past persecution on account of his political opinion, and the reports regarding the Eritrean government's harsh and extra-legal treatment of its critics, the presence of such a mixed-motive would certainly be more likely than not in Nuru's case.

In *INS v. Ventura*, 537 U.S. 12 (2002) (per curiam), the Supreme Court held that it is the responsibility of the BIA to determine the issue of changed circumstances[19] in the first instance. *See id.* at 14. *Ventura* does not preclude our decision here, however. Other than the irrelevant argument that the Eritrean government will now have an additional ground for punishing Nuru, the INS has made no assertions concerning changed circumstances, either before the immigration judge or the BIA, or on review here, and has offered no evidence, documentary or otherwise, to that end. Indeed, the record

---

[18]The government asserts that the punishment Nuru suffered prior to his desertion was not disproportionate and, by implication, that the post-removal conduct would not be either. Although punishment for desertion is permissible under international law, the punitive sanction of torture is never lawful and is *per se* disproportionate. *See* pt. I(C), *supra*. Because the record reflects that upon his return Nuru would likely suffer persecutory treatment similar to that which he suffered in the past, persecutory treatment that we have already deemed to constitute torture, the government's argument cannot stand; we repeat: torture is never proportionate.

[19]At the time of the Court's decision in *Ventura*, the regulations permitted the government to rebut the presumption of a well-founded fear with evidence of changed country conditions. Since then, the regulations have been amended so that the government may rebut that presumption with evidence of changed circumstances. *See* 8 C.F.R. § 1208.13(b)(1)(i)(A).

before us contains *no* evidence that circumstances or country conditions in Eritrea have changed at all, let alone changed sufficiently to rebut the presumption that Nuru has a well-founded fear of future persecution. To the contrary, the country report suggests that, if anything, conditions are growing worse. "In these circumstances, to provide the INS with another opportunity to present evidence of changed country conditions when it twice had the chance, but failed to do so, would be exceptionally unfair." *Baballah v. Ashcroft*, 367 F.3d 1067, 1078 n.11 (9th Cir. 2004) (as amended). *See Ndom*, 384 F.3d at 756. "Under some circumstances . . . such as where the government has made no arguments before the immigration judge or the BIA concerning changed conditions, we do not remand." *Mamouzian*, 390 F.3d at 1135 (citations omitted). The INS has made it clear in Nuru's case, as it has in others we have considered, that it does not assert any change in circumstances, and that there is, therefore, no such issue for the Board to determine initially.

Finally, even if Nuru were precluded from relying on the presumption of a well-founded fear of future persecution, we would still be compelled to hold that he has established such a fear. This is so because, as we explained *supra* at pt. I, it is highly probable that Nuru will be tortured if he is returned to Eritrea, and torture is the ultimate form of persecutory conduct. If the motivation for the torture that awaits Nuru is in part based on political opinion, he will have easily met the lesser burden of establishing a well-founded fear of persecution. *See Mansour v. Ashcroft*, 390 F.3d 667, 673 (9th Cir. 2004) (outlining the standard for establishing a well-founded fear). Although Nuru's flight from his country (and possibly the military) might provide a substantial part of the motivation for the persecutory actions in which his government would likely engage on his return, there is little doubt that the political opposition Nuru expressed to the Sudanese war while in the military would also play a part in the future retaliatory conduct. Presumption or not, the fact of past persecution of an individual on account of a statutorily protected ground must

be given substantial weight when evaluating the reasons for renewed persecution of that person at a later date, regardless of any change in circumstances. Because the agency reached the future persecution issue in Nuru's case and resolved it against Nuru, the question of a *Ventura* remand does not arise in connection with that ruling.

**[16]** We hold that the government has not rebutted the presumption of a well-founded fear and that Nuru is eligible for asylum. Alternatively, we hold that, even without the presumption, Nuru has established the requisite fear of future persecution on account of political opinion. Because the ultimate decision to grant asylum is discretionary, we remand for a determination of whether Nuru is to be granted that relief. *See Mamouzian*, 390 F.3d at 1135; 8 U.S.C. § 1158(b)(1).

## III.   Withholding of Removal

**[17]** The finding of past persecution also triggers a presumption that Nuru has shown a clear probability of future persecution. *See Ndom*, 384 F.3d at 756; 8 C.F.R. § 1208.16(b)(1)(i). Again, there is nothing in the record to rebut that presumption and the government fails to argue that the presumption is or could be rebutted. The only arguments it offers are ones we have already rejected: 1) that the punishment Nuru faces will be imposed for reasons other than his political opinion, and 2) that the punishment will not be disproportionately harsh. Again, as we have explained in connection with Nuru's asylum claim, on this record the undisputed facts of Nuru's case, even without the presumption, establish the existence of a clear probability of future persecution. Nuru is, therefore, entitled to withholding of removal under IIRIRA. *See* 8 U.S.C. § 1231(b)(3).

## IV.   Immigration Judge

**[18]** Finally, it appears to us that the immigration judge's treatment of Nuru during the hearing and his characterization

of Nuru's behavior was arbitrary and capricious. Some of the judge's comments both during the hearing and when issuing his oral ruling were highly caustic and without substance. Having initially labeled Nuru a "common deserter" who acted more like a "personal coward than one interested in the safety of his colleagues who are injured and dying," he refused Nuru's counsel's request to present closing argument and suggested without basis in the record that counsel's coaching could diminish Nuru's "believability." Given his comments during the hearing and our strikingly different appraisal of the record, we order that the case be assigned to a different immigration judge who will afford Nuru the impartiality to which all applicants are entitled. *See Garrovillas v. INS*, 156 F.3d 1010, 1015, 1016 n.4 (9th Cir. 1998) ("The parties would be far better served by the assignment to those proceedings of a different [immigration judge].").

## CONCLUSION

Nuru has met his CAT burden. It is more likely than not that he will be tortured if he is returned to Eritrea. Accordingly, he is entitled to mandatory withholding of removal on the basis of his claim under the Convention.

Because Nuru has a well-founded fear of persecution on account of a statutorily protected ground, he is also eligible for asylum. We grant the petition and remand for the exercise of discretion with respect to the asylum claim.

We also conclude that Nuru has demonstrated that "it is more likely than not that [he] would be subject to persecution in the country to which he would be returned." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 423 (1987) (quotation marks omitted). He is therefore entitled to withholding of removal on his withholding claim under IIRIRA.

Additionally, we direct that this case be assigned to a different immigration judge upon remand.

**PETITION FOR REVIEW GRANTED; REMANDED FOR FURTHER PROCEEDINGS IN CONFORMITY WITH THIS OPINION.**