Opinion by Judge BERZON; Concurrence by Judge NOONAN; Dissent by Judge CALLAHAN.
OPINION
BERZON, Circuit Judge:
We consider the application of Hubert George Cole (Cole), a citizen and national of Honduras, for deferral of removal under the Convention Against Torture (CAT). The Board of Immigration Appeals (BIA) denied the application, concluding that Cole had not established he would more likely than not be tortured if removed to Honduras. Because the BIA failed to give reasoned consideration to potentially dis-positive testimony by Cole’s expert witnesses and did not address all of Cole’s claims, we grant the petition and remand to the BIA.
I.
Cole, a 40-year-old, black, former gang member, was born in Honduras and entered the United States at age eleven with his mother and two sisters. Cole has a lengthy criminal history in the United States, beginning when he was a juvenile. While in prison, he joined the Crips, an African American gang, as a way to protect himself from Hispanic gangs. While a member of the Crips, he was tattooed with gang-related symbols and letters on his face and body. In August 2007, Cole was the victim of a drive-by shooting; he was seriously injured and needs ongoing medical care.
The Department of Homeland Security commenced removal proceedings against Cole on July 11, 2008. The Notice to Appear charged that Cole was removable because he entered without being admitted or- paroled and was convicted, on June 18, 1999, for possession of cocaine for sale. Cole conceded removability and applied for asylum, withholding of removal, and relief under CAT. After the immigration judge (IJ) denied all his claims for relief, Cole appealed only the CAT claim to the BIA, *765 which dismissed the appeal. Whether the BIA properly denied CAT relief is the only issue before us.
A. Factual Background
Cole testified that while incarcerated as a young man, he felt threatened by Hispanic gang members, joined the Crips for protection, and acquired several Crips tattoos, including a teardrop under his eye, a G behind his ear, and tattoos on his calves, arms and back. Once released from prison Cole stopped associating with the Crips and worked at a homeless services agency. Nevertheless, rival gangs could still identify him as a Crips gang member because of his tattoos. According to Cole, Hispanic gangs hate the Crips and kill Crips gang members. Cole has not had the tattoos removed because tattoo removal is a painful and long process.
Despite disassociating himself from the Crips, Cole continued to feel threatened by Hispanic gang members. In August 2007, Cole was the victim of a drive-by shooting by Hispanic gang members.[1] He was outside a store with a friend when a car with four or five Hispanic people drove by; the car’s occupants were pointing at him and yelling out them gang affiliation — Santa Monica 13. Cole and his friend quickly got back into their car. But, before his Mend could get his car started, the other car pulled up on the passenger side, where Cole was sitting, and a Hispanic man started shooting at Cole.
Cole was shot in the head and abdomen. Half his liver and part of his skull had to be removed because of the shooting. Hospitalized for five or six months, Cole was still experiencing problems related to his brain injury at the time of his testimony. In his declaration, Cole stated that he now has a defective, fragile skull and that he can easily injure his brain if he is not careful. A letter from his doctor confirmed that he has a “sizable skull defect with no protection of his brain” and asserted that, for this reason, incarceration could put him at a high risk of serious injury. Cole’s doctor told him he will be in pain for a long time and will likely have seizures in the future, necessitating ongoing medical care.
Cole maintains that if returned to Honduras, he will be tortured and possibly killed by gangs, police, or death squads, because of his race and his gang-related tattoos.[2] He testified that his race,[3] his *766 tattoos, his general appearance, and even his accent will mark him as an outsider in Honduras, and that he believes that, even if the police do not harm him themselves, they will think he is a gang member and so not protect him. Cole also fears that the police will detain him and that he will be intentionally exposed to torturous ■ prison conditions because of his tattoos. Finally, Cole contends that he will be intentionally denied necessary medical care by public health officials in Honduras because of his tattoos, and that the intentional denial of medical care also qualifies as torture.
Cole’s sister and mother testified that they are also afraid Cole will be tortured or killed if returned to Honduras and will not be able to receive the medical care that he needs.
1. Expert Testimony
Cole supported his CAT claim with testimony from two experts. Luis Javier Rodriguez (Rodriguez) testified as an expert on the “structure and dynamics of U.S. and Central American gangs, including the racial rivalries among those gangs.” He discussed the origins of two large Hispanic gangs, Mara Salvatrucha (MS-13) and 18th Street, and how those gangs spread to Central America, primarily through gang members deported from the U.S. Rodriguez explained that the Crips gang is viewed as. an enemy by Hispanic gangs, including MS-13 and 18th Street, whose members attack members of African American gangs. According to Rodriguez, the Hispanic gangs can easily spot Crips tattoos. He also testified that the Hispanic gang members brought their “anti-black culture” down to Central America when they were deported and that someone with Crips tattoos would likely be threatened, beaten, or killed in Central America by either MS-13 or 18th Street gang members.
Cole’s second expert, Elmer Javier Canales Mesa (Canales), had about nine years experience working with gang members and former gang members in Honduras. Canales testified that the two biggest gangs in Honduras are MS-13 and 18th Street and that members of these gangs kill people with tattoos from rival gangs such as the Crips. In Canales’ experience, the Honduran police do not investigate the murders of gang members or suspected gang members.
Canales also testified that it is illegal to be a member of a gang in Honduras and that having a gang-related tattoo can lead to a prison sentence of six to twelve years. According to Canales, suspected gang members in the area where he works are each detained by police two or three times per week and sometimes jailed. Honduran police also physically abuse suspected gang members by throwing them on the ground and beating them with their weapons.[4] In one case he knew of, a police officer tortured two gang members to death. That officer, a former police chief, is in jail as a result of an investigation by the organization for which Canales works. Generally, however, police are not held accountable for harming gang members.
Canales also testified about specific incidents in which police or prison guards killed suspected gang members in prison. In an incident that occurred three or four years before the hearing, 68 suspected gang members died after being shot by prison guards. The year he testified, more than 20 suspected gang members had been killed in jail on the first day they *767 arrived there; Canales attributed the slaughter to “police negligence.” He also testified about an incident in which 104 gang members died in a fire in their cell block. The guards blocked their escape by not opening the gate, and it was later determined that the fire was set by the police.
In Canales’ opinion, based on statistics, studies, and his experiences over the years, Cole has a 90% chance of being detained by the Honduran police and a greater than 75% chance of being killed by gang members in Honduras because of his Crips tattoos. Canales also testified about the risk Cole would face in Honduras from death squads and social cleansing aimed at eliminating gang members. According to Canales, groups of police and other powerful citizens torture and kill those they find undesirable, including suspected gang members. Canales reported that such groups act with complete impunity in Honduras.
Finally, Canales spoke about the inability of suspected gang members to get medical care in public hospitals in Honduras. He had personally accompanied gang members and former gang members to hospitals and had seen doctors refuse to care for them. One young man, wounded and bleeding, died in the waiting room because doctors refused to treat him. Most doctors in Honduras, Canales stated, would refuse to treat an individual with tattoos because they would suspect him of being a gang member. Also, he reported, the government does nothing to hold healthcare workers accountable in such situations, despite demands from his organization. According to Canales, Cole would be denied emergency medical care if he needed it and, in a non-emergency situation, would get treatment only if accompanied by the Commissioner for Human Rights.
Given the high risk of harm former gang members in Honduras face from rival gangs, police, and vigilante groups, most of the former gang members with whom he works attempt to remove their tattoos to make themselves less identifiable. There are some programs in Honduras to help former gang members remove tattoos, but, Canales reported, they cannot meet the demand,[5] and the process is long, extremely painful, and often results in visible scarring. In his written declaration, Canales explained that because such “scars are often visible ... these individuals remain a target for gang members, death squads, and the police.”
2. Documentary Evidence
Both Cole and the government submitted extensive documentary evidence, including reports by the U.S. government and by United Nations agencies. Many of the reports corroborated aspects of Cole’s experts’ testimony.
For example, the 2008 U.S. State Department report recognized several human rights problems in Honduras, such as “unlawful killings by members of the police and government agents; arbitrary and summary killings committed by vigilantes and former members of the security forces; violence against detainees by security forces; harsh prison conditions; [and] corruption and impunity within the security forces.” The report confirmed that gang membership, without more, was illegal in Honduras and punishable by up to 12 years in prison, and that police arrested *768 people based on factors such as their tattoos. The report also noted that private security companies and vigilante groups acted, with the complicity of police, as death squads to kill “supposed habitual criminals.”
Moreover, although the Honduran constitution prohibits torture, there were instances in which government officials employed such practices, including beatings and other abuse of detainees; The 2008 State Department report stated that the Committee for the Defense of Human Rights in Honduras had reported that police arbitrarily detained and sometimes tortured more than two dozen individuals during a government program called Operation National. The 2007 State Department report placed the number of individuals arbitrarily arrested and, sometimes, tortured under Operation National at more than 34,000 and noted that a number of prisoner deaths had been attributed to members of the security forces.
On the other hand, the 2008 State Department report acknowledged that the government had undertaken some investigations of illegal activities by security forces. For example, on June 6, 2008, a court found guilty and sentenced 21 of the 43 government officials implicated in a 2003 jail massacre.
Other documentary evidence confirmed and expanded on the information in the State Department reports. A 2007 Congressional Research Service report noted that increased violence by gangs has led to corresponding vigilantism, with increasing extrajudicial killings. It also acknowledged the July 2003 legislation in Honduras making membership in a gang punishable by up to 12 years in prison and confirmed that a prison fire in 2004 killed 107 inmates, mostly gang members. Similarly, a 2006 U.S. Agency for International Development (USAID) report on gangs in Honduras noted that the Honduran government’s strict approach includes rounding up tattooed individuals and putting them in prison for gang membership. The report also noted that when gang members were killed or died in prisons, often no one was punished.
An August 2008 report by the UN High Commissioner for Refugees (UNHCR) counted “lack of accountability and professionalism within the police,” “the frequent abuse of detainees,” and “a culture of impunity for violations of human rights including extrajudicial executions” as among Honduras’ biggest human rights problems. The report also discussed a 2006 anti-gang initiative that called for recruiting 30,000 to 60,000 private security personnel to join the efforts of the 10,000 armed services personnel and 8,000 police officers, and granting the private security personnel “the right to use any means necessary to deter assailants from committing criminal acts.” The report noted that the policy had led to mass arrests, and that there were reports of excessive and even lethal force being used by these private security forces. The UNHCR report also discussed evidence that death squads were executing gang members, noting “the widespread conviction that [the unlawful killings] are being committed by members of the existing or former security forces.”
Finally, numerous newspaper articles also discussed the problems of government-linked death squads, extrajudicial killings, and the high level of violence in Honduran prisons. Particularly disturbing were reports regarding fires in prison, some reportedly deliberately set by security forces, which have killed around 200 prisoners, mostly gang members. One article noted that an independent report commissioned by the President of Honduras found that in one prison fire, 51 of the 68 people who were killed had been “exe *769 cuted — shot, stabbed, beaten or burned to death by a force of the state police, soldiers, prison guards and prisoners working with the guards.”
B. IJ and BIA Decisions
The IJ denied Cole’s application for deferral of removal under CAT, finding that Cole’s evidence “str[ung] together a series of suppositions,” but did not show that each step in the hypothetical chain of events was more likely than not to occur.[6] In particular, the IJ (1) faulted the expert testimony about the likelihood that Cole would be tortured as lacking evidence that individuals similarly situated to Cole had been incarcerated and tortured; (2) noted that, according to the State Department report, torture is against the law in Honduras, and the state has prosecuted police officers for torture and other abuses, including for one of the jail massacres; and (3) characterizing Cole as arguing that lack of medical care and poor prison conditions in Honduras amount to torture, held that Cole had failed to meet the standard of specific intent to cause harm established in Villegas v. Mukasey, 523 F.3d 984 (9th Cir.2008). Although Cole argued that he would be intentionally denied medical care and that prison officials have intentionally created dangerous prison conditions, the IJ did not address these arguments.
Like the IJ, the BIA discounted Cole’s expert witness testimony about the likelihood that Cole would be tortured on the ground that the expert failed to give specific examples corroborating his opinion. The Board also held, as did the IJ, that Cole had not established by sufficient evidence each link in the chain of events that could result in his torture by police, death squads, or other gang members. The BIA did recognize that evidence in the record suggested that “the presence of a tattoo can cause an automatic association with gangs, and that a tattoo or suspected gang affiliation can equate to harsh treatment.” But the BIA found nothing in the record explaining why Cole could not have his tattoos removed to avoid being perceived as a gang member. Finally, the BIA determined that lack of medical treatment is not tantamount to torture. The BIA did not make any finding regarding government acquiescence in torture by death squads or gang members.
Cole timely filed this petition for review.[7]
II.
We review issues of law regarding CAT claims de novo. Edu v. Holder, 624 F.3d 1137, 1142 (9th Cir.2010). “Where the BIA conducts its own review of the evidence and the law, this panel only reviews the BIA’s decision, except to the extent it expressly adopts the IJ’s decision.” Eneh v. Holder, 601 F.3d 943, 946 *770 (9th Cir.2010). “The BIA’s findings underlying its determination that an applicant is not eligible for relief under the CAT are reviewed for substantial evidence.” Arteaga v. Mukasey, 511 F.3d 940, 944 (9th Cir.2007). “Under the substantial evidence standard, the court upholds the BIA’s determination unless the evidence in the record compels a contrary conclusion.” Id.
“Because neither the BIA nor the IJ made an adverse credibility finding, ‘we must assume that [Cole’s] factual contentions are true.’ ” Aguilar-Ramos, 594 F.3d at 704(quoting Navas v. INS, 217 F.3d 646, 652 n. 3 (9th Cir.2000)). “As a result, the facts to which [he] testified are ‘deemed true, and the question remaining to be answered becomes whether these facts, and their reasonable inferences, satisfy the elements of the claim for relief.’ ” Edu, 624 F.3d at 1143(quoting Nuru v. Gonzales, 404 F.3d 1207, 1216 (9th Cir.2005)).
III.
A. General CAT Principles
To qualify for CAT relief, a petitioner must establish that “it is more likely than not that he or she would be tortured if removed to the proposed country of removal.” 8 C.F.R. § 208.16(c)(2). In other words, Cole must “show only a chance greater than fifty percent that he will be tortured if removed to” Honduras. Hamoui v. Ashcroft, 389 F.3d 821, 827 (9th Cir.2004). In determining whether an individual will more likely than not be tortured, “all evidence relevant to the possibility of future torture shall be considered.” 8 C.F.R. § 1208.16(c)(3).
Importantly, an application for CAT relief need not show that he will be tortured “on account of’ any particular ground. See Kamalthas v. INS, 251 F.3d 1279, 1283 (9th Cir.2001). Moreover, where torture is sufficiently likely, “CAT ‘does not permit any discretion or provide for any exceptions.’ ” Edu, 624 F.3d at 1145 (quoting 64 Fed.Reg. 8478, 8481 (Feb. 19, 1999)). Instead, the provision for deferral of removal under CAT applies to all applicants, even those who, like Cole, are former gang members convicted of an aggravated felony. See 8 C.F.R. § 208.17(a); Lemus-Galvan v. Mukasey, 518 F.3d 1081, 1083 (9th Cir.2008) (holding that “even if an alien has been convicted of a ‘particularly serious crime,’ and is ineligible for withholding of removal under the CAT, an IJ is required to grant deferral of removal if the alien can establish the likelihood of torture upon return”). As we explained in Edu, “the words of CAT ... reach out to protect even the most vile of actors against state vileness.” 624 F.3d at 1146. Indeed, “in adopting the [CAT] regulations, the agencies themselves recognized that even those who assisted in Nazi persecutions, or engaged in genocide, or pose a danger to our own security are not excluded from the protections of CAT.” Id. at 1145. Further, “[a foreign] government cannot exempt torturous acts from CAT’s prohibition merely by authorizing them as permissible forms of punishment,” Nuru, 404 F.3d at 1221, nor do other circumstances provide a justification for denying deferral of removal where torture is sufficiently likely.
In other words, the policy against providing “sanctuary for universal outlaws” that led this court to conclude that gang members or former gang members are not a social group for the purposes of asylum and withholding of removal, see Arteaga, 511 F.3d at 946, does not preclude deferral of removal under CAT. Both the governing regulations and the case law of this circuit dictate that even gang members, both current and former, cannot be returned to a country in which they will more likely than *771 not be tortured. See 8 C.F.R. § 208.17(a); Arteaga, 511 F.3d at 949.
“Acts constituting torture” under CAT “are varied, and include beatings and killings.” Bromfield v. Mukasey, 543 F.3d 1071, 1079 (9th Cir.2008). The implementing regulations define torture as:
any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.
8 C.F.R. § 1208.18(a)(1). Acquiescence by government officials “requires only that [they] were aware of the torture but ‘remained willfully blind to it, or simply stood by because of their inability or unwillingness to oppose it.’ ” Bromfield, 543 F.3d at 1079 (quoting Ornelas-Chavez v. Gonzales, 458 F.3d 1052, 1060 (9th Cir.2006)). The torturer, whether a public official or a private party acting with the government’s consent or acquiescence, must have the specific intent to inflict severe harm. See Villegas v. Mukasey, 523 F.3d 984, 989 (9th Cir.2008).
B. Expert Testimony
Cole’s CAT claim depends heavily on the testimony of two experts, Rodriguez and Canales, as well as on documentary evidence corroborating their testimony. In determining whether Cole had established that he would more likely than not be tortured if returned to Honduras, the BIA was required to evaluate the expert testimony, as well as the documentary evidence in the record.
CAT’s implementing regulations so require: In making a CAT decision, the regulations state, “all evidence relevant to the possibility of future torture shall be considered, including ... [e]vidence of gross, flagrant or mass violations of human rights within the country of removal ... and ... [o]ther relevant information regarding conditions in the country of removal.” 8 C.F.R. § 1208.16(c)(3) (emphasis added). We therefore grant petitions for review in CAT cases where the BIA did not consider country conditions evidence in the record. See Aguilar-Ramos, 594 F.3d at 705 (remanding for the BIA to determine in the first instance whether the Country Report demonstrates a likelihood of torture); see also Bromfield, 543 F.3d at 1077, 1079; Al-Saher v. INS, 268 F.3d 1143, 1147 (9th Cir.2001). Indeed, “country conditions alone can play a decisive role in granting relief under the Convention.” Kamalthas, 251 F.3d at 1280.
In Aguilar-Ramos, for example, the government argued that “the Board is not required to cite and refute explicitly every piece of evidence offered on appeal”; this court responded that “[t]he regulations implementing CAT explicitly require the IJ to consider ‘all evidence relevant to the possibility of future torture,’” and also noted that country reports are accorded special weight in removal proceedings. 594 F.3d at 705 n. 6 (citations omitted).
That is not to say that the BIA must discuss each piece of evidence submitted. When nothing in the record or the BIA’s decision indicates a failure to consider all the evidence, a “general statement that [the agency] considered all the evidence before [it]” may be sufficient. See Almaghzar v. Gonzales, 457 F.3d 915, 922 (9th Cir.2006). But, where there is any indication that the BIA did not consider all *772 of the evidence before it, a catchall phrase does not suffice, and the decision cannot stand. Such indications include misstating the record and failing to mention highly probative or potentially dispositive evidence. See Aguilar-Ramos, 594 F.3d at 705 & n. 6; Eneh, 601 F.3d at 948-49; Bromfield, 543 F.3d at 1076-77; Kamalthas, 251 F.3d at 1283-84.
In particular, where potentially dispositive testimony and documentary evidence is submitted, the BIA must give reasoned consideration to that evidence. See Eneh, 601 F.3d at 948-49. We granted the petition for review in' Kamalthas, for example, because the BIA did not “consider probative evidence in the record of country conditions which confirm[ed]” torture of individuals with characteristics similar to the petitioner. 251 F.3d at 1284.
Here, the BIA neither asserted that it had considered all of the evidence nor evidenced in its opinion reasoned consideration of the potentially dispositive testimony of Cole’s two experts. Instead, the BIA stated only that the testimony of one of Cole’s experts “was unpersuasive in light of the other evidence, including the State Department report, ... because [he] failed to give specific examples to corroborate his opinion.” In so stating, 'the BIA did not clarify to which of Cole’s experts it was referring; nor did it address the other expert’s testimony at all. In other words, the Board did not evidence reasoned consideration of the testimony of Cole’s two experts.
Further, as to whichever expert the BIA opinion did reference, the Board was obliged to “state[] reasons in the record why the testimony was insufficient to establish the probability of torture necessary to grant CAT relief.” Aguilar-Ramos, 594 F.3d at 706 n. 7. It did not do that.
The BIA’s sole stated rationale for rejecting the one expert’s opinion is entirely unsupported by the record for two reasons. First, although the Board opined that the expert’s testimony was “unpersuasive in light of the other evidence,” specifically the State Department report, in fact that report corroborates rather than contradicts many aspects of both experts’ testimony. For example, although the 2008 report noted that torture was illegal in Honduras,[8] it also stated that human rights problems in Honduras included “unlawful killings by members of the police and government agents; arbitrary and summary killings committed by vigilantes and former members of the security forces; violence against detainees by security forces; harsh prison conditions; [and] corruption and impunity within the security forces.” The State Department report also noted that there are instances in which government officials beat and abuse detainees, and that human rights groups had reported over two dozen instances of torture due to one government initiative.[9] Additionally, the 2008 report acknowledged that police arrest individuals for having certain types of tattoos. Thus, while the report indicated that some officials are being investigated and convicted for abusing their authority, it also noted ongoing serious problems and so corroborated the experts’ testimony. Further, as *773 noted above, other documentary evidence corroborated their testimony as well.
Moreover, contrary to the Board’s assertion, the experts, in particular Canales, did testify about specific incidents of police torturing or killing suspected gang members. For example, Canales discussed an incident in which 68 suspected gang members were shot in jail by “members of the police guard”; an incident in which police set fire to a jail and killed 104 gang members; and an incident involving a police officer who tortured two gang members to death. Canales also testified that he had personally experienced police brutality, and personally witnessed tattooed individuals being denied medical care at public hospitals. Finally, Canales attempted to quantify the risk Cole faced if returned to Honduras, placing his risk of detention by the police at 90% and his risk of being killed by other gang members at 75%. The Board did not acknowledge these examples and estimates.
The government argues that Canales’ testimony should be discounted because he did not work with former members of the Crips gang and had very little firsthand knowledge regarding how former members of that particular gang are treated in Honduras. Canales’ lack of knowledge about the Crips gang does not mean, however, that his testimony is inapplicable to Cole. As the BIA recognized, evidence in the record demonstrates that tattoos “can cause an automatic association with gangs,” which can “equate to harsh treatment.” There is no record evidence suggesting that Cole would experience different treatment because his tattoos are affiliated with the Crips rather than with the gangs with which Canales primarily works. Moreover, Canales’ testimony about violence perpetrated by gang members on those they suspect of being rivals should have been evaluated alongside Rodriguez’s testimony, which focused on the rivalries between the Crips and the two dominant gangs in Honduras, MS-13 and 18th Street. Because the BIA acknowledged the testimony of only one of Cole’s experts, it appears that it never considered Cole’s CAT claim in light of the evidence presented by both experts.
Because the BIA mischaracterized the record with regard to one of the expert’s consistency with the State Department reports, criticized that expert’s testimony on a basis belied by the record, and failed even to acknowledge Cole’s other expert witness, it failed to give reasoned consideration to the potentially dispositive testimony of Cole’s two experts. We must therefore remand for the agency to reconsider Cole’s CAT claim in light of the expert testimony and the corroborating documentary evidence. See INS v. Ventura, 537 U.S. 12, 16, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002) (per curiam); see also Aguilar-Ramos, 594 F.3d at 705; Eneh, 601 F.3d at 948-49.
C. Intentional Denial of Medical Care
In addition to its errors regarding the testimony of Cole’s expert witnesses, the BIA also failed to consider Cole’s claim that he would face torture in Honduras as a result of intentional denial of medical care.
The applicable CAT regulations require that the torturer have the specific intent to inflict severe harm. 8 C.F.R. § 1208.18(a)(5). Acts that merely have the foreseeable result of inflicting harm are not sufficient; “the actor[must] intend the actual consequences of his conduct.” Villegas, 523 F.3d at 989. Thus, inhumane conditions and lack of access to appropriate medical care do not, in and of themselves, constitute torture. Id.; Eneh, 601 F.3d at 948. The IJ and BIA were therefore correct that a claim of made *774 quate health care in Honduras, without more, is insufficient to warrant CAT relief.
This court has recognized, however, that the intentional denial of medical care as a form of punishment could suffice to establish a CAT claim. Eneh, 601 F.3d at 948. Here, the BIA did not consider at all Cole’s claim that medical care would be intentionally withheld because of his gang tattoos, and that he, specifically, was likely to need medical care due to his brain injury.[10] There is at least some evidence supporting Cole’s contentions: Canales testified that he had personally witnessed staff at public hospitals let a victim bleed to death because he had tattoos. His opinion was that Cole, also tattooed, would similarly be denied emergency medical care in Honduras and would have only contingent, restricted access to other medical care. The BIA should have considered whether that was so, particularly given evidence in the record that Cole will need medical care in Honduras to deal with complications from his brain injury.
D. Tattoo Removal
Additionally, the BIA’s conclusion that Cole did not meet his burden under CAT rested in part on its assertion that Cole could “have his tattoos removed so that he would not be perceived as a gang member upon return to Honduras.” Given that statement, we cannot tell whether the BIA would have reached the same result had it not assumed that the tattoos could feasibly be removed in a timely manner.[11] But that assumption falters if the record evidence on the issue is credited: There is evidence that the tattoo removal process is quite long and extremely painful. Moreover, the process can leave permanent scarring. Canales also testified that there is a far greater demand for tattoo removal in Honduras than there are places that can provide such services, leading many tattooed individuals to resort to dangerous home remedies such as burning themselves with cigarette butts or battery acid. Added to likely lengthy delay in beginning tattoo removal is the length of time it takes to remove tattoos once the process begins. As a result of these circumstances, Cole would likely be unable to remove his tattoos until well after his arrival in Honduras, and thus would face being perceived as a gang member for as long as it took — likely quite a while — to get them removed. And even after getting his tattoos removed, the record indicates, visible scarring could mean that he would still be a targeted by rival gangs, police, and death squads.
The BIA’s statement concerning tattoo removal does not discuss any of this evidence or explain why it is not dispositive. Thus, once again, the BIA did not give reasoned consideration to potentially dis-positive testimony with regard to the prob *775 ability of torture, and we must remand for further consideration and explanation.
E. Aggregation of Risk
Finally, the BIA did not consider the aggregate risk that Cole would face from police, death squads, and gangs if returned to Honduras. Cole need not prove that each group, treated individually, would more likely than not torture him. Rather, he must establish that, taking into account all possible sources of torture, he is more likely than not to be tortured, by or with the consent or acquiescence of the government, if returned to Honduras. The BIA erred by treating each potential source of torture individually, never assessing Cole’s overall risk of being tortured.
IV.
The BIA did not give reasoned consideration to potentially dispositive testimony by Cole’s expert witnesses, corroborating documentary evidence, or evidence concerning removal of tattoos. Nor did it address Cole’s argument regarding the intentional denial of medical care or assess Cole’s risk of torture in the aggregate. We therefore GRANT Cole’s petition, VACATE the BIA’s decision, and REMAND for further proceedings consistent with this opinion.
VACATED and REMANDED.

. Cole also testified about one other specific instance in which he encountered Hispanic gang members after he was released from prison: Once, while he and his friends were watching fireworks at the Santa Monica pier, 18th Street gang members approached and asked them if they were Crips. Cole testified that there was a lot of tension until the police appeared and took some of the 18th Street gang members to jail. He testified that he believes "something terrible,” such as someone being stabbed, would have happened if the police had not arrived.

. The dissent emphasizes that there is no evidence in the record to suggest that the Crips operate in Honduras. It argues that there is, therefore, no reason to think that Cole will suffer harm because of his Crips tattoos. But Cole's claim does not rely on the presence of Crips in Honduras. Rather, he claims — and presented evidence — that (1) Hispanic gang members removed from the United States and returned to Honduras are likely to bring their rivalries with them and to recognize Cole's tattoos as those of a rival gang; (2) Honduran gangs are likely to see Cole as a threat because of his tattoos regardless of whether they can identify the gang with which he was affiliated; and (3) the Honduran government, police, and medical personnel associate tattoos with gang membership, regardless of the nature of the tattoo,, and are not likely to inquire further as to the meaning of the tattoo or whether a tattooed person maintains gang membership.

.The record includes documentation of racial inequality and discrimination in Honduras against Afro-Hondurans.

. Canales also testified that he had been punched in the back and chest by police for defending the youth with whom he worked.

. Out of desperation, some former gang members attempt to remove their tattoos using methods such as cigarette burns, mosquito repellent, car battery acid, acid creams, and metal cleaners. Former gang members go to such extreme lengths to remove their tattoos because young people with tattoos run a great risk of being killed.

. Cole's applications for asylum and withholding of removal were also denied.

. We note that Cole has been detained throughout these proceedings, which have lasted for more than three years, seemingly without a bond hearing. If so, then, as did the court in Aguilar-Ramos v. Holder, 594 F.3d 701 (9th Cir.2010), “we express grave concerns over [Cole’s three]-year detention,” id. at 704 n. 3, particularly given Cole's testimony that while in detention, he was not permitted the medications he needed to control the pain from his brain injury. Prolonged detention of aliens absent a bond hearing is not authorized by 8 U.S.C. § 1226(a). See Casas-Castrillon v. Dep’t of Homeland Sec., 535 F.3d 942, 950-51 (9th Cir.2008); see also Prieto-Romero v. Clark, 534 F.3d 1053, 1062 (9th Cir.2008) (holding that a three-year detention “qualifies as prolonged by any measure”). "We encourage [Cole] to challenge his detention by filing a habeas petition pursuant to 28 U.S.C. § 2241 or by requesting a bond hearing.” Aguilar-Ramos, 594 F.3d at 704 n. 3.

. That a country’s constitution prohibits torture does not establish that the country does not torture people. See Al-Saher, 26.8 F.3d at 1147 (stating that the country report noted that the Iraqi Constitution prohibited torture but reported that security forces routinely tortured detainees).

. The 2007 State Department report, also in the record, placed the number of individuals arbitrarily arrested and sometimes tortured at more than 34,000.

. Cole also argues that the BIA inadequately considered his claim that prison officials would intentionally allow him to be tortured and killed in prison by rival gang members. The agency found that Cole had failed to establish that he would more likely than not come to the attention of police and be detained in prison, and so did not consider what would happen were he detained. If, after reasoned consideration of potentially dispositive testimony and documentary evidence, the BIA reconsiders its conclusion regarding the likelihood that Cole will come to the attention of the police and be detained, it should address his claim that prison officials will intentionally subject him to dangerous conditions amounting to torture.

. It is also unclear whether, if it were feasible for Cole to remove his tattoos sufficiently to reduce his risk of torture, the BIA could deny CAT relief on that basis. The issue is not squarely before us, so we need not, and do not, address it.