**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| KARLENA DAWSON,<br>*Petitioner*,<br><br>v.<br><br>MERRICK B. GARLAND, Attorney General,<br>*Respondent*. | No. 19-73124<br><br>Agency No.<br>A072-583-249<br><br>OPINION |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted April 13, 2021
Pasadena, California

Filed May 26, 2021

Before:  Milan D. Smith, Jr. and Sandra S. Ikuta, Circuit Judges, and Kathryn H. Vratil,* District Judge.

Opinion by Judge Vratil;
Dissent by Judge Milan D. Smith, Jr.

---

* The Honorable Kathryn H. Vratil, United States District Judge for the District of Kansas, sitting by designation.

**SUMMARY**[**]

**Immigration**

Denying Karlena Dawson's petition for review of the Board of Immigration Appeals' decision affirming the denial of deferral of removal under the Convention Against Torture, the panel held that the record did not compel a finding that it is more likely than not that Dawson would suffer future torture if returned to Jamaica.

Dawson sought CAT relief based on the physical abuse she suffered at the hands of her former domestic partner. The panel agreed with the Board that even assuming Dawson suffered past torture, the record did not compel the conclusion that she faces a likelihood of future torture if returned to Jamaica, given her changed circumstances, including a Jamaican court's issuance of a protection order, and her former partner's departure from her household. The panel explained that in assessing the likelihood of future torture, the adjudicator must consider all evidence relevant to the possibility of future torture, including whether circumstances or conditions have changed significantly with respect to the particular individual, and not merely information about general changes in the country.

The panel also concluded that the record supported a finding that Dawson could safely relocate within Jamaica to avoid future torture, given that Dawson's former partner's purported connections to the government did not prevent Dawson from obtaining and enforcing the protection order,

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

which allowed her to stay in her former partner's home; the Jamaican police were responsive to reports when her former partner violated the protection order, arresting him on one occasion; and before returning to the United States, Dawson was able to relocate to her friend's house in another town where she had no physical contact with her former partner.

The panel rejected Dawson's contention that the IJ failed to consider or give proper weight to country report evidence concerning the treatment of women in Jamaica, which she asserted demonstrated a particularized risk of violence to herself.  The panel explained that circumstances for Jamaican women in general did not vitiate the agency's specific findings as to Dawson's situation, and that while the country reports reference generalized domestic violence against women, that evidence did not compel a conclusion that Dawson would more likely than not be subjected to violence from her former partner or his associates.

Dissenting, Judge M. Smith wrote that the record in this case compelled the conclusion that Dawson will more likely than not be tortured if returned to Jamaica.  Judge M. Smith noted that Dawson endured severe torture at the hands of her former partner, and wrote that in cases of past torture, such abuse is the "principal factor" for evaluating the likelihood of future torture, yet the majority turned a blind eye to the facts in Dawson's case, considering only what happened after she successfully sought a protection order.  Judge M. Smith observed that the vast majority of this circuit's "changed conditions" case law concerns changes in the immigrant's specific country of origin, and wrote that even assuming arguendo that a significant change in personal circumstances is sufficient to render past torture irrelevant in determining future torture, Dawson's circumstances did not significantly change, where despite a reduction in physical

violence post-protection order, Dawson's former partner remained obsessively fixated on stalking her, hurting her, and even killing her.

## COUNSEL

Kathryn M. Davis (argued) and Peter R. Afrasiabi, Supervising Attorneys; Courtney Lem (argued) and Wei Liu (argued), Certified Law Students; University of California at Irvine School of Law, Appellate Litigation Clinic, Pasadena, California; for Petitioner.

Robert Michael Stalzer (argued), Trial Attorney; Anna Juarez, Senior Litigation Counsel; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

## OPINION

VRATIL, District Judge:

Petitioner challenges a final order of removal issued by the Board of Immigration Appeals (BIA). In that decision, the BIA affirmed an Immigration Judge's (IJ's) denial of petitioner's request for deferral of removal under the Convention Against Torture (CAT). *See* 8 C.F.R. § 1208.13(c)(1). We hold that the record does not compel a finding that it is more likely than not that petitioner will suffer future torture if returned to Jamaica. We also hold that the IJ appropriately considered all of petitioner's evidence, including her country reports and whether she could safely relocate if returned to Jamaica. We thus deny the petition for deferral of removal.

## Standard Of Review

The Court reviews for substantial evidence the factual findings which underlie the BIA's conclusion regarding eligibility for CAT protection. *Avendano-Hernandez v. Lynch*, 800 F.3d 1072, 1078 (9th Cir. 2015). Substantial evidence means that the findings are "supported by reasonable, substantial, and probative evidence in the record." *Melkonian v. Ashcroft*, 320 F.3d 1061, 1065 (9th Cir. 2003). To reverse a factual finding, the evidence must "compel" a conclusion different from the one which the BIA reached. *Zheng v. Holder*, 644 F.3d 829, 835 (9th Cir. 2011); *see also INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992). In reviewing the decision of the BIA, this Court considers only the ground relied upon by the BIA. *Singh v. Holder*, 649 F.3d 1161, 1164 n.6 (9th Cir. 2011); *see also Arrey v. Barr*, 916 F.3d 1149, 1157 (9th Cir. 2019) (court cannot affirm on grounds on which BIA did not rely).

We may refer to the IJ's decision when "the BIA's decision . . . accorded significant deference to the IJ's observations." *Kin v. Holder*, 595 F.3d 1050, 1054 (9th Cir. 2010); *see also Parada v. Sessions*, 902 F.3d 901, 909 (9th Cir. 2018) (where BIA reviews IJ's decision and incorporates portions of it as its own, Court treats incorporated portions as decision of BIA). The Court's review is limited to the administrative record before the BIA. *See* 8 U.S.C. § 1252(b)(4)(A).

## Factual And Procedural Background

Karlena Dawson is a native and citizen of Jamaica who, starting around 1992, made multiple unlawful entries into the United States. In late 2009 or 2010, Dawson was arrested for shoplifting and had an outstanding warrant from a 1996 drug charge. On July 20, 2010, Dawson was sentenced to

63 months in prison for unlawful importation of a controlled substance in violation of 21 U.S.C. § 952(a). On April 24, 2014, she completed her period of incarceration and was removed to Jamaica.

On February 8, 2019, Dawson attempted to reenter the United States by claiming to be a United States citizen. After immigration inspectors determined that she was not a citizen, Dawson expressed a fear of returning to Jamaica and was found to possess a credible fear of persecution if returned. In the ensuing removal proceedings, she sought deferral of removal under CAT.[1]

## I. Proceedings Before The Immigration Judge

The basis of Dawson's CAT claim was physical abuse at the hands of her former domestic partner in Jamaica, a man named Robert Hinds. Dawson testified and offered documentary evidence in support of her application. The documentary evidence included her declaration; a temporary protection order against Hinds from a magistrate judge in Jamaica; and three reports which described existing conditions in Jamaica—the 2018 U.S. Department of State report on human rights abuses in Jamaica, a 2018 United Nations High Commissioner for Refugees Report and a 2016 United Nations Women's Health Survey for Jamaica.

---

[1] Because of her controlled substance conviction, Dawson sought only deferral of removal under CAT. *See* 8 C.F.R. §§ 1208.13(c)(1), 1208.16(d)(2) (applicant who has been convicted of particularly serious crime subject to mandatory denial of asylum and withholding of removal); 8 C.F.R. § 1208.17(a) (applicant subject to mandatory denial under 8 C.F.R. § 1208.16(d)(2) "shall be granted deferral of removal to the country where he or she is more likely than not to be tortured").

In testimony on May 29, 2019, Dawson explained that she met Hinds in 2006 in Phoenix, Arizona. At first, she thought that he would protect her, but in early 2007 he began to physically abuse her. They dated for about eight months, until he was incarcerated and eventually removed to Jamaica. In April of 2014, when released from her own incarceration, Dawson returned to Jamaica to be with Hinds. Hinds sent a police officer to escort Dawson through customs so that she would not be stopped for processing. The officer delivered her to Hinds, who sequestered her in his house. Hinds kept her locked in the house and instructed her to not speak to anyone, to not try to leave and to do the laundry on certain days. He also started to physically abuse her again.

While Dawson lived with Hinds, Hinds forced her to go to his farm, where he beat her and threatened to behead her if she did not work. She recounted one particular day when she refused to go to the farm, and Hinds' friends forced her into a van and burned her hands as punishment. According to Dawson, she still had burn marks on her hands and scars on her knees where Hinds had dragged her. Because of her injuries, she could not make a tight fist with either hand.

On multiple occasions starting in 2016, Dawson reported Hinds to the police. The first time she reported him, the police sent two officers who were friends of Hinds. These officers tried to evict her from Hinds' house, but neighbors rallied and yelled at the police officers until they left. Dawson then complained at a different police station, which only gave her a police report. In July or August of 2016, Dawson went to family court and obtained an order of protection which allowed her to stay in Hinds' house. As soon as the judge issued the order, Hinds drove to the house and tried to break in. A neighbor took a picture of Hinds

pulling the sliding glass door off the house and sent the picture to Dawson. Dawson went to the police station and reported Hinds, and police arrested him for violating the court order. The police released Hinds later that day, and that night he came back to the house with a gun, shot out one of the outdoor lights, and then left. After the court issued the protection order, Hinds never lived in the house again. In 2018, the court issued a five-year stay-away protection order. After that, Dawson did not know where Hinds lived.

After the initial protection order in 2016, Dawson attended court once a month. When she returned home from court each month, Hinds waited for her further up the street, along with two police friends who would come and harass her. The officers would stay for 15 to 20 minutes, tell her to "go back to America" and state that she would "end up dead" because Hinds needed his house and "has to be paying rent." Neighbors again rallied and told the officers to leave her alone.

After the protection order was issued, Hinds frequently drove by the house but only entered it twice. The first time he came to pick up his clothes, and when she told him to leave, he slapped her and left. The second time, Hinds came through the open back door and told Dawson that the house belonged to him. When Dawson protested, Hinds pushed her. Dawson yelled, and neighbors again rallied and the police came. In addition, Hinds' mother showed up on one occasion to try to evict Dawson and change locks, but the police came and told Hinds' mother that because of the protection order, Dawson could not be evicted.

In 2017, Dawson began to experience bleeding and pain in her stomach, which required her to be hospitalized in two hospitals over the course of two months. As a result of the bleeding, she received a blood transfusion. In her

declaration, Dawson explained that the doctors "didn't really know what was wrong with [her]" and asked her, "Who is punching you in the stomach?"

In October of 2018, Dawson moved to Spanish Town, which was approximately 20 to 30 minutes away from Hinds' house. Until January of 2019, when she returned to the United States, she stayed there with a friend. During this period, Hinds "came by like around five, six times" and threatened her. After she returned to the United States, Hinds continued to harass the friend in Spanish Town who had helped her leave, and he left a bullet on her friend's porch.

When asked what she feared if she returned to Jamaica, Dawson said that she "will sure be killed." She explained that police officers and Hinds "will have [her] killed" because she was suing for the return of money from a malpractice settlement that Hinds took from her daughter. Dawson suggested that Hinds would be able to find her in Jamaica because she would have to go to court for her civil suit.

## II.  The Immigration Judge's Decision

In June of 2019, the IJ issued a written decision which denied Dawson's application for deferral of removal and ordered her removed to Jamaica.[2] The IJ found that even

---

[2] Although Dawson was only seeking deferral of removal, the IJ "out of an abundance of caution" analyzed whether Dawson's drug conviction was for a particularly serious crime which would preclude her from seeking asylum, withholding of removal under 8 U.S.C. § 1231(b)(3), and withholding of removal under the regulations implementing CAT. The IJ concluded that Dawson's conviction was for such a particularly serious crime. Dawson did not appeal this conclusion to the BIA, nor did she contest it in her petition for review. Dawson therefore waived this

though Dawson's testimony was credible, she had failed to demonstrate eligibility for deferral of removal. The IJ assumed that Hinds' past treatment of Dawson constituted torture, but that in light of subsequent developments, Dawson had not established that it was more likely than not that Hinds would torture her in the future. In particular, the IJ noted that Hinds did not live with Dawson after she obtained the protection order, and police responded on at least one occasion to arrest him for violating the order. The IJ explained that although Dawson continued to suffer harassment from Hinds, "the severe abuse from Hinds ended" after she obtained the protection order. As a result, the IJ found that during the last two years Dawson lived in Jamaica, she did not suffer "a level of harm approaching torture." The IJ therefore concluded that she had not demonstrated that she would more likely than not suffer torture in the future.

The IJ also assessed whether Dawson had established that a public official or other person acting in an official capacity would consent or acquiesce to her torture. The IJ found that "nothing in the record suggest[ed] [Dawson] will be subjected to torture by the Jamaican government or with its acquiescence." The IJ noted that Hinds often brought his "police friends" to the home, but noted that Dawson was able to file police reports against Hinds and obtain the order of protection, which was "viable until 2023."

The IJ also examined the evidence of conditions within Jamaica, including "issues with corruption within the police

---

issue. *See, e.g.*, *Alvarado v. Holder*, 759 F.3d 1121, 1127 n.5 (9th Cir. 2014) (requiring issue exhaustion before BIA); *Christian Legal Soc'y v. Wu*, 626 F.3d 483, 485 (9th Cir. 2010) (issues waived if not raised in opening brief).

force and a generalized trend of violence towards women." The IJ concluded that a pattern of violations alone was insufficient to establish that Dawson would be personally at risk of torture.

Accordingly, because Dawson had not demonstrated eligibility for deferral from removal, the IJ ordered her removed to Jamaica.

## III.    The BIA Decision

Dawson filed a timely administrative appeal to the BIA, arguing that the IJ had erred in denying her request for deferral of removal under CAT. On December 2, 2019, the BIA affirmed the IJ's decision and dismissed Dawson's appeal. The BIA discerned "no clear factual error" in the IJ's finding that Dawson was not more likely than not to be tortured by Hinds or his associates if she returned to Jamaica. The BIA explained that the IJ had appropriately concluded that even if Dawson had suffered past torture from Hinds, it significantly diminished after (1) she obtained a protection order and (2) Hinds left the domestic household. The BIA concluded that after those changes in circumstance, Hinds' conduct "was not so severe as to constitute torture within the meaning of the applicable regulation." *See* 8 C.F.R. § 1208.18(a)(2).

The BIA also found no clear error in the IJ's analysis of country conditions evidence. The BIA acknowledged Dawson's argument that the IJ had given insufficient weight to evidence related to domestic violence, but found no clear error "in the manner in which the Immigration Judge weighed the evidence of record, or his predictive findings as to what is likely to occur if [Dawson] is removed to Jamaica."

In consequence, the BIA affirmed the IJ's decision and dismissed Dawson's appeal. In a footnote, the BIA explained that because it was affirming the IJ's predictive finding about the likelihood of future torture, it need not resolve Dawson's challenge to the IJ's finding regarding whether a public official in Jamaica would acquiesce to such torture. In doing so, the BIA adopted the IJ's decision in part.

## Analysis

Petitioner seeks review of the BIA's decision which denied deferral of removal under CAT. *See* 8 C.F.R. § 1208.13(c)(1). Petitioner argues that (1) by limiting its consideration to events which occurred after the protection order, the BIA failed to the consider the totality of the evidence about the likelihood of future torture; (2) the BIA erred by failing to consider evidence that petitioner cannot safely relocate if returned to Jamaica; and (3) the IJ failed to appropriately consider country reports.[3] The Court will consider each argument in turn.

## I.   Likelihood Of Future Torture

The first issue is whether substantial evidence supports the BIA's determination that petitioner did not establish that, more likely than not, she would face torture if returned to Jamaica. The BIA's finding that an applicant is not eligible for relief under CAT is reviewed for substantial evidence.

---

[3] Petitioner also argues that the record demonstrates acquiescence of a public official. She argues that if the BIA had considered the IJ's error, the BIA would have been compelled to reverse. The BIA expressly stated that it was unnecessary to review the IJ's finding whether the torture would occur by or with the acquiescence of a Jamaican government official. Because we deny this petition on the issue of likelihood of future torture, we need not address this issue.

*Cole v. Holder*, 659 F.3d 762, 770 (9th Cir. 2011); *Arteaga v. Mukasey*, 511 F.3d 940, 944 (9th Cir. 2007). Administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary. *See* 8 U.S.C. § 1252(b)(4)(B); *Elias-Zacarias*, 502 U.S. at 481 n.1.

Dawson argues that in finding that she had not shown a probability of future torture, the BIA failed to give appropriate weight to evidence of past torture. In rendering a decision about the likelihood of future torture, the BIA is required to consider "all evidence relevant to the possibility of future torture." 8 C.F.R. § 1208.16(c)(3); *see Parada*, 902 F.3d at 914–15. Past torture is one such relevant consideration, *see* 8 C.F.R. § 1208.16(c)(3)(i), in that someone who has been tortured in the past is likely to be tortured in the future if returned to the same situation. *See Nuru v. Gonzales*, 404 F.3d 1207, 1217–18 (9th Cir. 2005). In and of itself, however, a showing of past torture "does not give rise to a regulatory presumption of . . . future torture." *Lopez-Gonzalez v. Sessions*, 743 F. App'x 726, 728 (9th Cir. 2018) (citing *Mohammed v. Gonzales*, 400 F.3d 785, 802 (9th Cir. 2005)); *see also* 8 C.F.R. § 1208.16(c)(3). The inference that future torture is likely to recur breaks down where "circumstances or conditions have changed significantly, not just in general, but with respect to the particular individual." *Nuru*, 404 F.3d at 1218; *see also Xochihua-Jaimes v. Barr*, 962 F.3d 1175, 1188 (9th Cir. 2020) (applicant likely to be tortured again if returned to site of prior suffering "absent changed circumstances"); *Cole*, 659 F.3d at 770, 775 (BIA must "consider the *aggregate* risk that [applicant] would face").

Here, Dawson argues that the horrific nature and extent of past torture at the hands of Hinds, in league with the local

police, is the appropriate background against which the BIA must evaluate the likelihood of future torture. Petitioner contends that the protection order and Hinds' removal from the domestic household did not significantly change her situation because they did not eliminate the risk of future torture and the torture did not stop. To illustrate, she cites the following post-protection order incidents: (1) Hinds tried to break in to the household and was subsequently arrested; (2) Hinds appeared on the street once a month after Dawson returned from court and yelled at her, with police friends who harassed and threatened her; (3) Hinds frequently drove past the house, one time wielding a gun and shooting out the porch light; (4) Hinds entered the house on two occasions—once to pick up his clothes, and once to tell Dawson that the house belonged to him—and slapped or pushed her before leaving; and (5) after Dawson returned to the United States, Hinds left a bullet on the doorstep of her friend's house in Spanish Town.

We agree with the BIA that even assuming that petitioner suffered past torture, the record does not compel the conclusion that Dawson faces a likelihood of future torture if returned to Jamaica. The dissent describes in detail the torture that Dawson suffered at the hands of Hinds when they lived in his house together from approximately April of 2014 to July of 2016, *see* Dissent at 20–21. The IJ and the BIA assumed that "the harm [Dawson] experienced at one time from Mr. Hinds amounted to torture," and we do not disagree. Dawson's circumstances "changed significantly," however, after the Jamaican court issued her a protection order and Hinds left the domestic household. *See Nuru*, 404 F.3d at 1217–18; *see also Xochihua-Jaimes*, 962 F.3d at 1188. According to Dawson's testimony, these changes had a significant impact on her situation: Dawson went from suffering daily physical abuse by Hinds to seeing him drive

past the house or yell from the street roughly once a month. Dawson's situation changed even more significantly when she left Hinds' house and moved in with her friend in Spanish Town, after which Hinds "came by like around five, six times" over the course of approximately two months and never had physical contact with her. The dissent analogizes the past torture that Dawson suffered to the torture that the petitioner in *Xochihua-Jaimes* suffered, *see* Dissent at 23-24. But in our case, the conditions in Jamaica for Dawson changed after she obtained the protection order; in *Xochihua-Jaimes*, on the other hand, the conditions in Mexico for petitioner "remain[ed] the same" as when the past torture took place, *see Xochihua-Jaimes*, 962 F.3d at 1188.

As noted, the inference that future torture is likely to recur based on past torture breaks down upon consideration of the entire record, including the post-protection order evidence. From July of 2016 (when Dawson obtained the protection order) to January of 2019 (when Dawson left for the United States), Hinds slapped or pushed Dawson only twice; otherwise, she did not suffer any physical harm. Hinds verbally harassed her from the street, and on one occasion, his police officer friends told her to go back to America or she would "end up dead." Her neighbors intervened, however, and she was not harmed. Hinds left a bullet on her friend's porch, but Dawson no longer lived there. Without more, these incidents do not constitute torture or compel a finding that future torture is likely. *See* 8 C.F.R. § 1208.18(a)(2) (torture "does not include lesser forms of cruel, inhuman or degrading treatment"); *see, e.g.*, *Vitug v. Holder*, 723 F.3d 1056, 1066 (9th Cir. 2013) (record did not compel finding that petitioner who was beaten several times in Philippines would more likely than not be tortured if returned); *Duran-Rodriguez v. Barr*, 918 F.3d 1025, 1029–

30 (9th Cir. 2019) (petitioner did not show more likely than not that he would be tortured, even though he received two death threats from private actors). In fact, we have often found that such incidents do not create a well-founded fear of future persecution to support an asylum claim, which has a lower burden than the standard for torture under CAT. *See Singh*, 764 F.3d at 1163; *see, e.g.*, *Gu v. Gonzales*, 454 F.3d 1014, 1020–22 (9th Cir. 2006) (record did not compel finding of past persecution when petitioner struck in back of head ten times with rod).

The dissent argues that *Nuru* does not support our conclusion because *Nuru* discusses changed country conditions, not changed personal circumstances. Dissent at 21. This is a misreading of *Nuru*, which directs us to consider whether "circumstances or conditions have changed significantly, not just in general, *but with respect to the particular individual*," 404 F.3d at 1218 (emphasis added), and further holds that the adjudicator must conduct "an individualized analysis of how changed conditions will affect the specific petitioner's situation," not merely an analysis of "[i]nformation about general changes in the country," *id.* at 1218 n.6 (cleaned up). In evaluating a CAT claim, we must consider "all evidence relevant to the possibility of future torture," *Wakkary v. Holder*, 558 F.3d 1049, 1068 (9th Cir. 2009) (citation omitted), including changes to the petitioner's individual circumstances. *See Konou v. Holder*, 750 F.3d 1120, 1126 (9th Cir. 2014) (despite petitioner's evidence of past torture due to sexual orientation, BIA's denial of CAT relief supported by substantial evidence, including evidence that he was no longer a homeless child but a "self[-]sufficient homosexual adult").

Because the record in its entirety does not compel a contrary result, we must uphold the BIA's finding that petitioner did not show that more likely than not, she will face torture if returned to Jamaica.

## II. Relocation

The second issue is whether the BIA erred by failing to consider evidence that petitioner cannot safely relocate if returned to Jamaica. In assessing CAT claims, the BIA must consider all evidence, including "[e]vidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured." *See* 8 C.F.R. § 1208.16(c)(3)(ii). A petitioner is not required to prove that internal relocation is impossible; rather, relocation is just one factor the BIA must consider in assessing the likelihood of future torture and is not determinative on its own. *See Maldonado v. Lynch*, 786 F.3d 1155, 1162–64 (9th Cir. 2015) (en banc). The record must contain evidence that a general or specific area exists where the petitioner could safely relocate within the country of removal. *Xochihua-Jaimes*, 962 F.3d at 1186–87.

Dawson argues that the record does not contain evidence of a general or specific area where she can safely relocate in Jamaica. She contends that the BIA failed to consider her testimony regarding how Hinds is well connected in the Jamaican government and will be able to track her down and prevent her from safely relocating. She also points to country reports which show how Jamaica is a relatively small island, which makes it easier for people to be tracked down.

Here, the IJ stated that evidence of relocation would be considered and subsumed the analysis within the discussion of the likelihood of future torture and government acquiescence. The IJ noted that Hinds' purported

connections to the government did not prevent Dawson from obtaining and enforcing the protection order. The protection order allowed her to stay in Hinds' home, and the Jamaican police were responsive to reports when Hinds violated the protection order, arresting him on one occasion. The BIA agreed with the IJ that the protection order significantly diminished the level of harm and helped ensure Dawson's safety while living in Jamaica. The BIA also agreed that the country reports were insufficient to show that individually, Dawson more likely than not would be tortured if removed to Jamaica. The record further demonstrates that before returning to the United States, Dawson was able to relocate to her friend's house in Spanish Town where she had no physical contact with Hinds. In the context of the protection order, the record supports a finding that Dawson can safely relocate within Jamaica. Because the evidence does not compel a different conclusion from the one which the BIA reached, we must affirm.

## III.    Country Reports

The final issue is whether the IJ appropriately considered all of petitioner's evidence, including her country reports. To qualify for deferral, petitioner must demonstrate that she, in particular, would more likely than not face torture upon return to Jamaica. *See* 8 C.F.R. § 1208.16(c)(2); *Zheng*, 644 F.3d at 835–36 (rejecting torture claim where "claims of possible torture remain speculative"). For us to reverse the BIA with respect to a finding of fact, the evidence must compel a different conclusion from the one which it reached. *See Elias-Zacarias*, 502 U.S. at 481 n.1.

Petitioner argues that the IJ did not consider or give proper weight to the country reports about treatment of women in Jamaica, which petitioner asserts demonstrate a particularized risk of violence to her. The circumstances of

Jamaican women in general, however, do not vitiate the agency's specific findings as to petitioner's situation with Hinds. While country conditions include generalized domestic violence against women, this does not compel a conclusion that petitioner will more likely than not be subjected to violence from Hinds or his associates.

Because the record does not compel a contrary result, we must uphold the BIA's finding that the IJ appropriately considered all of petitioner's evidence, including her country reports. Therefore, we affirm the BIA and deny the petition for review.

**PETITION DENIED.**

M. SMITH, Circuit Judge, dissenting:

An applicant is entitled to relief pursuant to CAT if she establishes that "it is more likely than not that . . . she would be tortured if removed to the proposed country of removal," and that a public official would acquiesce in that torture. *Madrigal v. Holder*, 716 F.3d 499, 508 (9th Cir. 2013) (internal quotation marks and citation omitted).

The record in this case compels the conclusion that Dawson will more likely than not be tortured if returned to Jamaica. When an applicant who has previously been tortured seeks relief under CAT, the "principal factor" on which we rely for evaluating the likelihood of future torture is past torture. *Nuru v. Gonzales*, 404 F.3d 1207, 1217–18 (9th Cir. 2005). Here, the record reflects that Dawson endured severe torture at the hands of her ex-partner, Robert Hinds.

The majority omits the gory details of Hinds's abuse of Dawson, notwithstanding the fact that our case law requires that we consider them in determining whether Dawson is entitled to relief.  Let me supply the details.  Dawson met Hinds in 2006 while she was living in a domestic violence shelter in Arizona.  Hinds began abusing her—he sat outside her work, watching her all day, threatened to "beat on [her]" if he saw her with anyone else, and physically hurt her "quite often."  He "threatened to kill [her] if [she] left him."

Once Dawson and Hinds were deported to Jamaica, the abuse escalated to torture.  Hinds confined Dawson to his home, which had "bars wrapped around [it] . . . like a prison" and "blood spattered on the walls."  Dawson learned from Hinds's aunt that his previous girlfriend lived in the house prior to Dawson moving in, and the blood was from their fights.  Hinds supposedly "kicked the baby out of" his previous girlfriend when she was six months pregnant.

From that moment on, Hinds "constantly" beat, raped, threatened, stole from, and otherwise controlled Dawson.  Hinds either locked Dawson in his house or forced her to accompany him everywhere he went, "watching [her] every move."  Hinds assured Dawson that "if [she] ever tried to escape that he would cut [her] head off and put it in [a ditch on his family's property]."  Hinds "kicked [her] and pushed [her] directly into [burning] coals," beat her to the ground and "stomped [her] in the stomach," "hit [her] on the side of [her] head with a water bottle," and "threatened to kill [her]" with a machete.  Hinds's friends, most of whom were police officers, also threatened Dawson, telling her that they would kill her and leave her "body at the side of the road."

To this day, Dawson has "scars on [her] back, stomach, legs, hands, and elbows."  As my colleagues note, Dawson was hospitalized for two months for a blood clot that left her

"throwing up blood." Her injury was a result of Hinds "punching [her] in the stomach." In Dawson's own words, she was just "lucky to be alive" after a four-pint-blood transfusion.

Hinds's abuse clearly constitute acts of torture under our case law. As we held in *Avendano-Hernandez v. Lynch*, 800 F.3d 1072, 1079 (9th Cir. 2015), rape, severe beatings, and threats "certainly rise[] to the level of torture for CAT purposes." Similarly, in *Xochihua-Jaimes v. Barr*, 962 F.3d 1175, 1188 (9th Cir. 2020), we concluded that multiple instances of rape over the petitioner's lifetime, along with ongoing death threats, amounted to past torture. In both cases, we remanded with instructions for the agency to grant the petitioners CAT relief because the level of past torture sufficiently demonstrated the likelihood of future torture, "particularly in the form of sexual abuse." *Xochihua-Jaimes*, 962 F.3d at 1188; *see also Avendano-Hernandez*, 800 F.3d at 1079–80, 1082.

My colleagues turn blind eyes to the facts in Dawson's case. They consider only what happened after Dawson successfully sought a protection order against Hinds because they contend that the protection order changed Dawson's circumstances significantly. Slip Op. at 14–15. In support of this conclusion, my colleagues cite *Nuru*, 404 F.3d at 1218. Notably, however, *Nuru* discusses changed *country* conditions, not changed personal circumstances. In *Nuru*, we explained that the "changed conditions" analysis that applies "in asylum and withholding of removal cases" also "applies in the torture context." 404 F.3d at 1218 n.6. Our primary contention was that "[i]nformation about general changes in the country is not sufficient" to establish changed conditions. *Id.*

This makes sense given that the vast majority of our "changed conditions" case law in the immigration context concern changes in the immigrant's specific country of origin. Our CAT case law only tangentially refers to a change in personal circumstances as a relevant changed condition. *See, e.g.*, *Konou v. Holder*, 750 F.3d 1120, 1126 (9th Cir. 2014) (holding the petitioner's circumstances changed because he was no longer a child but "a self[-]sufficient homosexual adult") (quotation marks omitted). Instead, the relevant change is usually a coup in the petitioner's country of origin, or that country's growing acceptance of that a certain minority group. *See, e.g.*, *Chand v. INS*, 222 F.3d 1066, 1078–79 (9th Cir. 2000); *Smolniakova v. Gonzales*, 422 F.3d 1037, 1051–52 (9th Cir. 2005); *see also Sowe v. Mukasey*, 538 F.3d 1281, 1288 (9th Cir. 2008) ("[J]ust as changed country conditions can defeat an asylum claim, they can also defeat a claim for CAT protection."). How *Nuru*'s discussion of changed country conditions supports my colleagues' conclusion in Dawson's case remains unclear—it is undisputed that Jamaica's conditions have not changed since Dawson was brutally tortured there.

In CAT cases, our case law specifically requires the BIA "to consider *all evidence* relevant to the possibility of future torture." *Parada v. Sessions*, 902 F.2d 901, 914–15 (9th Cir. 2018) (emphasis added). Obviously, this would include past torture, which begs the question of whether it is even proper for us to ignore any part of the record—as the majority does with Dawson's pre-protection order abuse—in denying CAT relief.

Even assuming *arguendo* that a significant change in personal circumstances is sufficient to render past torture irrelevant in determining future torture, Dawson's

circumstances did not significantly change. Post issuance of the protection order, the physical abuse Dawson suffered may have diminished, but Hinds remained obsessively fixated on stalking her, hurting her, and even killing her, which by themselves constitute torture.

In Dawson's own words, the protection order "didn't stop [Hinds]," "he constantly violated [it]." "[O]nce every two days [Hinds] would drive by the house," "[h]it the glass doors," and harass and intimidate Dawson. *See contra* Slip Op. at 14–15. Hinds entered the home twice. The first time was right after the judge issued the protection order. Hinds ran to the shared home, pulled a door off its frame, and "dragged [Dawson] out of the house." Hinds returned to the home one hour later, armed with a gun, and "shot out one of the outdoor lights." The second time was two years later, right after the judge issued a permanent protection order against him. This order "of course made [Hinds] very mad . . . [and he] came up to the house and started yelling at his friends to come help him to 'beat this woman,' referring to [Dawson]." Because the situation with Hinds "was getting really, really serious," Dawson fled to Spanish Town to stay with a friend. Yet Hinds found her and continued stalking her. Hinds went so far as visiting the friend's daughter's school—all to threaten Dawson. Hinds's threats continued after Dawson left Jamaica: he left a bullet on the doorstep of Dawson's friend's home in Spanish Town.

Dawson remains certain that if she is returned to Jamaica, Hinds will kill her or have her killed by someone on his behalf. The protection order, therefore, did not solve the problem—Hinds continued to be a dangerous, threatening presence in Dawson's life. Because Dawson's circumstances did not significantly change after the issuance of the protection order, we must consider Hinds's actions

within the context of the severe torture Dawson suffered at his hands.

When considered in its entirety, Dawson's case most closely resembles *Xochihua-Jaimes*.  In that case, the petitioner's partner severely abused, raped, and threatened her.  *Xochihua-Jaimes*, 962 F.3d at 1180.  Even after she managed to separate from him, he molested her children, broke into her home, and directed his friends to harass, intimidate, and threaten her.  *Id.*  We ultimately concluded that the petitioner's showing of past torture demonstrated a likelihood of future torture, even though her ex-partner had been arrested and imprisoned.  *Id.* at 1180, 1188.  We held that the ongoing death threats from those associated with her abuser "demonstrate[d] some likelihood that she would again suffer severe assault or indeed, . . . death."  *Id.*  Dawson's case compels the same conclusion.

I respectfully dissent.